FILED
CHARLOTTE, NC

JAN 0 9 2013

US District Court
Western District of NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| [UNDER SEAL] ) | CIVIL CASE NO.: 3:12CV817 |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | **FILED UNDER SEAL /** |
| ) | **QUI TAM COMPLAINT** |
| [UNDER SEAL] ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |
| ) | |

**SEVERED SECOND AMENDED QUI TAM COMPLAINT
FOR VIOLATIONS OF FEDERAL AND STATE FALSE
CLAIMS ACTS AND THE ANTI-KICKBACK STATUTES**

# DO NOT FILE ON PACER

# DO NOT PLACE IN PRESS BOX

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, NORTH CAROLINA, CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, NEVADA, NEW JERSEY, NEW MEXICO, OKLAHOMA, TENNESSEE, TEXAS, and VIRGINIA <u>ex rel</u>. THOMAS L. MASON, M.D., | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.: 3:12CV817 |
| Plaintiffs | ) ) | **FILED UNDER SEAL** |
| | ) | **DO NOT PLACE ON PACER** |
| v. | ) ) | |
| COMMUNITY HEALTH SYSTEMS, INC. | ) ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | SEVERED SECOND AMENDED QUI TAM COMPLAINT |
| | ) | |

**SEVERED SECOND AMENDED QUI TAM COMPLAINT**
**FOR VIOLATIONS OF FEDERAL AND STATE FALSE**
**CLAIMS ACTS AND THE ANTI-KICKBACK STATUTES**

## Table of Contents

I. INTRODUCTION ....................................................................................................... 1

II. JURISDICTION AND VENUE ................................................................................ 1

III. PROCEDURAL HISTORY ...................................................................................... 3

IV. THE PARTIES .......................................................................................................... 3

A. Plaintiff/Relator, Thomas L. Mason, MD, FACEP ............................................... 3

B. The Defendant, Community Health Systems, Inc. ("CHS") ................................... 6

1. Corporate Structure of Defendant CHS ................................................................. 8

a. CHS Division Executives Direct Hospital Management ........................................ 9

b. CHS'S Professional Services Corporation Management Team ............................... 9

3. CHS Emergency Room Initiatives to Optimize Revenues Include Pro-MED Systems ....... 10

V. BACKGROUND ON FEDERAL & STATE-FUNDED

HEALTH INSURANCE PROGRAMS ................................................................. 11

A. Medicare Program ................................................................................................. 11

1. Medicare Covers Only Medically Necessary Services ........................................ 11

2. Medicare Coverage for Hospital Emergency Room Services ............................... 13

3. Billing for Inpatient Care for Patients Admitted to the Hospital

through the Emergency Room ............................................................................... 14

B. The Medicaid Program .......................................................................................... 15

C. Other Federal Health Care Programs .................................................................... 16

VI. APPLICABLE LAW ............................................................................................... 16

A. The Federal False Claims Act ............................................................................... 16

B. The Federal Anti-Kickback Statute ....................................................................... 17

VII. RELATOR MASON OBSERVES HMA'S USE OF ER

PROGRAMS DEVELOPED BY PRO-MED CLINICAL SYSTEMS, LLC ...................... 20

A. HMA's Corporate Leadership Structure ............................................................... 20

1. Relator's Knowledge of ER Programs Developed by Pro-MED Clinical Systems, LLC .... 20

a. Pro-MED Clinical Systems, LLC .......................................................................... 20

b. HMA Implements Pro-MED Systems: Patient Manager, Complaint

Test Mapping (Practice Guidelines), and Case Management Software ............... 21

i

 c. Pro-MED's ER Software Used at HMA's Hospitals ............................................. 23

PRO-MED COMPLAINT TEST MAPPING (PRACTICE GUIDELINES) SOFTWARE ........ 24

PRO-MED CASE MANAGEMENT SOFTWARE USED AT HMA TO

INCREASE ADMISSIONS: QUALITY REVIEW AND QUALCHECK ................................ 24

QUALCHECK ........................................................................................................... 25

 2. Patient Flow through HMA Emergency Rooms Using Pro-Med Systems ........................... 27

 3. HMA's Billing Process, Including Providing a Billing Record to MEMA ........................ 30

 4. HMA's "Quality" Improvements Using Pro-MED Software and Services –

  Creating Revenue through Unnecessary Tests and Admissions ........................................... 33

 5. HMA Implements Pro-MED CTM Guidelines to Generate Illegal Charges

  from Unnecessary ER Tests – Not to Improve Patient Satisfaction - and

  Interfering with the Physician's Delivery of Appropriate Care ........................................... 34

 a. Limited Flexibility – Before October 2008, Some EDs Edit HMA

  Corporate Test Guidelines ................................................................................ 36

 b. HMA's Complaint Test Mapping Guidelines Generate Many

  Medically Unnecessary Tests ............................................................................ 38

 6. HMA Imposes Benchmarks to Enforce Adherence to CTM Guidelines ........................... 40

 a. Patients with CTM Tests Ordered ........................................................................ 40

 b. CTM Guidelines Tests Ordered ........................................................................... 41

 7. HMA Implements Pro-MED Patient Manager Software, Including Quality Review,

  Physician EMR, and QualCheck, and Related ED Benchmarks to Generate Illegal

  Revenues from Unnecessary Admissions to HMA Hospitals ........................................... 43

 a. Admissions Benchmarks: Emphasis on Revenues from Medicare Patients ...................... 44

PERCENT OF ADMISSIONS ..................................................................................... 44

CALLING ATTENDING PHYSICIANS TO INCREASE HOSPITAL ADMISSIONS ............ 45

 b. HMA's National Demands to Increase Medicare Admissions ............................................. 46

 c. Benchmarks for Quality Review and QualCheck of Discharged Patients ........................... 49

 8. The Fall of 2008: HMA Increases Pressures on Hospital ED Physicians to

  Meet Corporate Benchmarks Aimed at Unnecessary Admissions and Tests ...................... 50

ii

a. HMA Uses Pro-MED's Daily, Weekly, and Monthly Reports to Implement Its Illegal Program to Generate Revenues through Excessive Tests and Unwarranted Admissions ................................................................................... 51

b. Newsome Leaves Defendant CHS and Returns to HMA Bringing Intensified Support for Focus on ER Revenues ................................. 53

9. Revised (2008) Complaint Test Mapping Guidelines ........................................... 54

10. HMA Executives Harass Emergency Room Physicians to Drive Tests and Admissions .... 56

11. HMA Required ED Directors to Review and the Medical Executive Committees (MECs) to Approve the 2008 Pro-MED Complaint Test Mapping Guidelines in Attempt to Shift Responsibility for Fraudulent Tests to Emergency Patients ...................... 58

12. Relator's Attempt to Work with HMA to Reduce the Complaint Test Mapping Guidelines to More Acceptable Levels ............................................... 60

a. HMA's National CTM Task Force Meets at Its Naples, Florida Headquarters ................. 61

b. Complaint Test Mapping Abuses Continues After the Florida Task Force Meeting .......... 65

13. HMA's Drive in 2009 and 2010 to Force Emergency Physicians to Adhere to HMA's Corporate Benchmarks for Admissions ............................................... 66

14. HMA Established Revenue-Generating Corporate ED Benchmarks for Testing and Admissions without Support that they Promote the Quality of Patient Care ................. 69

15. MEMA Meets Other HMA Benchmarks Not Focused Solely on Maximizing Revenues ... 71

16. HMA's Efforts to Use Pro-MED's Nurse and Physician Documentation to Increase Facilities Charges ................................................................. 73

a. HMA Boasts Increased Acuity Led to Increased Revenues ................................. 74

b. HMA's Benchmark for Nursing Acuity ...................................................... 74

c. Over-Documenting Acuity Through Nurses' So-Called "Extended Teaching" ................ 75

d. Pro-MED Prompts Physicians to Document for "Critical Care" ............................. 76

17. Pro-MED Actively Advanced HMA's Efforts to Generate Revenue from Unnecessary Tests and Admissions .......................................................... 76

VIII. FRAUD ALLEGATIONS BY RELATOR MASON AGAINST DEFENDANT CHS: .... 78

iii

CHS Employs Pro-MED Systems to Bill Federal and State Healthcare Programs for Unnecessary Emergency Room Services (Diagnostic Studies) and In-Patient Admissions of ER Patients....................................................................................... 78

A. Relator Mason Knows Former CHS Executives from Their Tenure at HMA: Newsome, Reynolds, and Lowe Left CHS Division II to Join HMA.................................... 79

1. Former CHS Division II Executives: Gary Newsome and Britt Reynolds............................. 79

2. Former CHS Division II Hospital Executive, Greg Lowe.................................................. 80

3. Relator Mason Learns in February 2009 that HMA's New CEO (CHS's Former Division Executive) Brought the Excessive 2008 Pro-MED CTM Guidelines to HMA from CHS.......................................................................... 80

4. HMA Offers Kickbacks (Lucrative Contracts and Cash) to Induce ER Physicians, to Refer or Recommend Patients for Unnecessary In-Patient and Out-Patient Treatment (Diagnostic Tests and Admissions).......................................... 80

HMA ATTEMPTS TO INDUCE MEMA WITH CASH TO MEET CORPORATE BENCHMARKS.......................................................................................................... 81

5. Greg Lowe Tells Relator Mason: CHS Offers ED Physicians Incentives to Meet Pro-MED "Quality Indicators" ............................................................ 83

6. MEMA and Relator Mason Notify HMA CEO Newsome that HMA's ER Practices Involve Fraud and Abuse ......................................................................... 84

B. Relator Mason's Efforts to Find Moonlighting Work Led Him to CHS and Back to the Familiar Pro-MED Systems and Software............................................... 86

1. Relator Mason's Contact with the ED Director at CHS's Springs Memorial ...................... 86

2. Relator Mason's Meeting at Springs Memorial on January 27, 2011: Relator Mason Observes CHS and HMA Use the Same Pro-MED Systems and Programs.......................... 88

THE PRO-MED "SUPER USER" AT CHS'S SPRINGS MEMORIAL...................................... 89

3. CHS Emergency Department Metrics: "Admit, Admit, Admit" ......................................... 91

4. CHS ED Benchmarks: Illegally Generating Revenues through Medicare Patients (>65) .............................................................................. 93

CHS AGGRESSIVELY AVOIDS TRANSFERS OF PATIENTS OVER 65 ............................... 93

5. CHS'S Unofficial Benchmarks May Be Higher.............................................................. 94

iv

6.   CHS's Pro-MED CTM Guidelines: Unnecessary Tests ........................................ 95

a.   CHS'S ER Triage Metric Ensures Unnecessary CTM Tests are
     Ordered and Cannot be Cancelled ........................................................ 96

b.   CHS'S Master Pro-MED CTM Guidelines ............................................. 97

c.   Springs Memorial Pro-MED CTM Guidelines ....................................... 98

d.   Pro-MED CTM Guidelines for CHS: True and False Tests ................... 100

7.   Mason Meets at Springs Memorial on March 8, 2011: Pro-MED
     Physician EMR Training ....................................................................... 100

PRO-MED'S CTM GUIDELINES AT CHS: PRO-MED TRAINERS WEIGH IN ................ 102

8.   CHS "Locks" CTM Guidelines and Edits Require Management Permission ................... 103

9.   CHS Uses Pro-MED Systems to Submit or Cause Unnecessary Tests and Admissions .... 103

a.   CHS's Emergency Room Initiatives to Optimize Revenues
     Include Pro-MED Systems ..................................................................... 103

b.   CHS Uses Pro-MED ED Systems and Software To Illegally
     Generate Hospital Revenues .................................................................. 105

c.   CHS has Failed to Meet Medicare Conditions of Participation ........................................ 107

COUNT I (U.S. EX REL. MASON V. CHS) - VIOLATION OF THE FEDERAL FALSE
CLAIMS ACT 31 U.S.C. § 3729(A)(1)(A), (B), AND (G) ................................................... 108

COUNT II (NORTH CAROLINA EX REL. MASON V. CHS) –NORTH CAROLINA
FALSE CLAIMS ACT N.C. GEN. STAT. § 1-605 ET. SEQ. ................................................ 111

COUNT III (CALIFORNIA EX REL. MASON V. CHS) - CALIFORNIA
FALSE CLAIMS ACT CAL GOVT. CODE § 12651(A)(1) AND (2) ................................... 112

COUNT IV (FLORIDA EX REL. MASON V. CHS) - FLORIDA FALSE CLAIMS ACT
FLA. STAT. ANN. § 68.082(2) ......................................................................................... 113

COUNT V (GEORGIA EX REL. MASON V. CHS) - GEORGIA STATE
FALSE MEDICAID CLAIMS ACT GA. CODE ANN. § 49-4-168.1 (A)(1) AND (2) ............ 114

COUNT VI (ILLINOIS EX REL. MASON V. CHS) - ILLINOIS WHISTLEBLOWER
REWARD AND PROTECTION ACT 740 ILL. COMP. STAT. § 175/3(A)(1) AND (2) ....... 115

COUNT VII (INDIANA EX REL. MASON V. CHS) - INDIANA FALSE CLAIMS AND
WHISTLEBLOWER PROTECTION ACT IC 5-11-5.5-2(B)(1), (2), AND (8) ...................... 116

v

COUNT VIII (LOUISIANA EX REL. MASON V. CHS) - LOUISIANA
MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA. REV. STAT. ANN.
§§ 46:439.1-4, 46:440.1-4..................................................................................................... 117
COUNT IX (NEVADA EX REL. MASON V. CHS) - NEVADA FALSE CLAIMS ACT
NEV. REV. STAT. ANN. § 357.040.1(A) AND (B) ................................................. 118
COUNT X (NEW JERSEY EX REL. MASON V. CHS) NEW JERSEY
FALSE CLAIMS ACT N.J. STAT. ANN. § 2A:32C-3(A) AND (B) ...................................... 119
COUNT XI (NEW MEXICO EX REL. MASON V. CHS) - NEW MEXICO
MEDICAID FALSE CLAIMS ACT N.M. STAT. ANN. § 27-14-4A AND C ........................ 120
COUNT XII (OKLAHOMA EX REL. MASON V. CHS) - OKLAHOMA
MEDICAID FALSE CLAIMS ACT 63 OKLAHOMA STATUTES ANNOTATED
§ 5053 ET. SEQ. ................................................................................................... 122
COUNT XIII (TENNESSEE EX REL. MASON V. CHS) - TENNESSEE MEDICAID
FALSE CLAIMS ACT TENN. CODE ANN. § 71-5-182(A)(1)(A) AND (B)........................ 123
COUNT XIV (TEXAS EX REL. MASON V. CHS) - TEXAS MEDICAID FRAUD
PREVENTION ACT TEXAS CODE § 36.001, ET. SEQ. .................................................... 124
COUNT XV (VIRGINIA EX REL. MASON V. CHS) - VIRGINIA FRAUD AGAINST
TAXPAYERS ACT VA. CODE ANN. § 8.01-216.3A.1 AND 2.............................................. 125
DEMAND FOR A JURY TRIAL ................................................................................ 127

## I.    INTRODUCTION

This qui tam action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and analogous state false claims acts related to emergency room ("ER") care provided in facilities owned, managed, or operated by Community Health Systems, Inc. ("CHS"). Through his legal counsel, Pietragallo Gordon Alfano Bosick & Raspanti, LLP and Wyatt & Blake, LLP, Qui Tam Relator Thomas L. Mason, M.D. brings this action on his own behalf, and on behalf of the United States of America and the States of North Carolina, California, Florida, Georgia, Illinois, Indiana, Louisiana, Nevada, New Jersey, New Mexico, Oklahoma, Tennessee, Texas, and Virginia against Defendant CHS.

## II.    JURISDICTION AND VENUE

1.    This action arises under the laws of the United States of America to redress violations of the federal FCA, 31 U.S.C. § 3729 *et seq.*, and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

2.    Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

3.    The Court has jurisdiction over Defendant's violations of the false claims and Anti-Kickback Statutes of the States of North Carolina, California, Florida, Georgia, Illinois, Indiana, Louisiana, Nevada, New Jersey, New Mexico, Oklahoma, Tennessee, Texas and Virginia pursuant to 31 U.S.C. § 3732(b), because Defendant's violations of these state laws and their violations of the federal FCA arise from the same transactions or occurrences. The Court has pendent jurisdiction over Defendant's state law violations because these state law violations and claims and Defendant's violations of the federal FCA arise out of a common nucleus of operative facts.

1

4. Defendant CHS is headquartered in Franklin, Tennessee. The Court has personal jurisdiction over the Defendant because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because the Defendant has at least minimum contacts with the United States, and can be found in, transact or has transacted, business in the Middle District of Tennessee.

5. Defendant CHS regularly performs healthcare services and submit or cause the submission of thousands of claims for payment to federal and state health care programs, including, but not limited to, Medicare and Medicaid, and accordingly, are subject to the jurisdiction of this Court.

6. Venue lies under 28 U.S.C. § 1391(b),(c) and 31 U.S.C. § 3732(a) because the Middle District of Tennessee is a district in which any one Defendant can be found or transacts business, and an act proscribed by 31 U.S.C. § 3729 occurred within this district. The Court also has jurisdiction over the causes of action brought under the laws of the various states for the recovery of funds paid by a State or local government because these arise from the same facts forming the basis of the action brought under 31 U.S.C. § 3730.

7. The specific facts, circumstances and allegations of the Defendant's violations of the federal and state False Claims Acts have not been publicly disclosed in a civil suit or administrative civil money penalty proceedings in which the government is already a party.

8. Relator Mason is the original source of all information upon which this Complaint is based with regard to Defendant CHS, as that phrase is used in federal and state FCAs, and he has provided information of the allegations of this Complaint to all governments prior to filing his Complaint.

2

## III. PROCEDURAL HISTORY

9. On April 18, 2011, Relator Mason filed, under seal with this Court, a Qui Tam Complaint alleging that Defendant CHS submitted or caused the submission of false claims to federal and state health programs, in violation of the federal False Claims Act, 31 U.S.C. § 3279, et seq. and analogous state false claims acts.

10. On April 12, 2012, Qui Tam Relator Mason filed, under seal with this Court, a Second Amended Complaint.

11. This Severed Second Amended Complaint is being filed pursuant to the Court's Order dated December 10, 2012.

12. Pursuant to this Court's Order, and the federal False Claims Act, 31 U.S.C. § 3730(b), this case has remained under seal while the United States and the named states of North Carolina, California, Florida, Georgia, Illinois, Indiana, Louisiana, Nevada, New Jersey, New Mexico, Oklahoma, Tennessee, Texas, and Virginia, have been investigating the allegations in Relator's Second Amended Complaint.

## IV. THE PARTIES

### A. Plaintiff/Relator, Thomas L. Mason, MD, FACEP

13. Plaintiff/Relator Thomas L. Mason, MD is a resident of North Carolina and a citizen of the United States.

14. Relator Thomas L. Mason, MD, FACEP, is board-certified in emergency medicine and licensed to practice medicine under the laws of North Carolina.

15. Since 1994, Dr. Mason has been in private practice. He is a principal shareholder in Mid-Atlantic Emergency Medical Associates, PA ("MEMA"), which provides emergency room coverage under professional services agreements with a number of hospitals in and around the

3

Charlotte, North Carolina area.

16.     Dr. Mason also served as the Medical Director, Emergency Department, Lake Norman Regional Medical Center, Mooresville, NC (1997 – November 2010). Lake Norman is a hospital operated by Health Management Associates ("HMA"). Until 2000, Dr. Mason also provided emergency room professional services at Presbyterian Hospital in Charlotte, NC, as well as Presbyterian Hospital - Matthews in Matthews, NC.

17.     Thomas L. Mason, M.D earned a B.A. from the University of North Carolina, Chapel Hill, a B.A. from the University of North Carolina, at Greensboro, and his medical degree, with honors, from the University of North Carolina, Chapel Hill, North Carolina. Dr. Mason served his internship and residency in Emergency Medicine at North Carolina Baptist Medical Center of Wake Forest University, where he was Chief Resident of Emergency Medicine.

18.     Relator Mason also served until November 3, 2010, as Chairman, Emergency Department Committee, Lake Norman Regional Medical Center, where he has served as the Chief of Staff and Vice Chief of Staff. In addition, he had also served as a member of the Medical Executive Committee ("MEC") at Lake Norman Regional Medical Center for 13 years. Dr. Mason has served as the Immediate Past President, President, and President–Elect of the Board of Directors, North Carolina College of Emergency Physicians ("NCCEP"). In 2006, Dr. Mason was named Emergency Physician of the year by the NCCEP.

19.     Dr. Mason also serves as a Councilor, American College of Emergency Physicians, as an Oral Board Examiner, American Board of Emergency Medicine, and as Chairman, EMTALA Compliance Committee, Lake Norman Regional Medical Center. Relator Mason has served on the North Carolina Medicare Carrier Advisory Committee, the Audit and Review Committee, Iredell County Emergency Medical Services, Statesville, North Carolina, and as Chairman and Associate

4

Chair of the Research Committee, North Carolina College of Emergency Physicians. Dr. Mason is a current and former member of many local and national prestigious professional scientific societies. He is a Fellow of the American College of Emergency Physicians ("ACEP").

20.     Relator Mason began working in the Lake Norman ED in 1994. In 1996, MEMA was awarded the ED contract there. In approximately 1997, Dr. Mason became the Lake Norman ED Medical Director there, and he continued in that position until he was terminated on November 3, 2010. As Lake Norman ED Medical Director, Relator Mason served as a conduit between MEMA, HMA's hospital executives and administrators at Lake Norman, and HMA's corporate executives.

21.     MEMA is a professional medical corporation organized and existing under the laws of the State of North Carolina. MEMA's principal place of business is located at 1900 Randolph Road, Suite 900, Charlotte, North Carolina. Founded in 1976 as Mecklenberg Emergency Medical Associates, MEMA is a physician-owned practice providing high quality emergency and acute medical care throughout greater Charlotte and the Piedmont area of North Carolina. Prior to November 3, 2010. MEMA had 60 physician members. MEMA currently has 50 physician shareholders and may be losing others as a result of incidents alleged in the Complaint.

22.     All but one of MEMA's physicians are board-certified in emergency medicine. Until late summer of 2010, MEMA physicians provided Emergency Room ("ER") coverage under professional services agreements with five hospitals, three Presbyterian facilities in Mecklenberg County and two HMA hospitals in Iredell County, North Carolina. Since HMA summarily terminated MEMA's contracts, MEMA has been unable to replace these contracts.

23.     MEMA physicians have staffed EDs in both for-profit hospitals and not-for-profit facilities. MEMA physicians staff emergency rooms at two for-profit HMA facilities (HMA's Lake

5

Norman and Davis Regional), and three non-profit hospitals in the Presbyterian/Novant network (Presbyterian Hospital - Charlotte, Presbyterian Hospital - Matthews, and Presbyterian Hospital - Huntersville). Accordingly, they are in a unique position to see the differences in approaches to care between profit and non-profit hospitals on a daily basis.

24.     Health Management Associates, Inc. ("HMA") is a multi-billion dollar Delaware for-profit corporation whose principal place of business is located at 5811 Pelican Bay Boulevard, Naples, Florida 34108. It is one of the largest for-profit hospital management companies in the United States.

25.     At the end of 2006, HMA reported that its business strategy to improve hospital operations included targeted marketing strategies, and "various clinical means to increase the utilization of the services provided by our hospitals, particularly emergency and outpatient services." Of note, HMA reported to Wall Street that its growth during 2009 resulted from both increased emergency room visits and increased hospital admissions.

26.     One significant clinical tool that HMA uses to increase utilization of services is Pro-MED, which HMA describes as "a computer-accessed diagnostic tool that helps doctors assess a patient's condition, formulate a diagnosis and suggest a course of treatment." HMA's reliance on Pro-MED systems to increase utilization of hospital services across the HMA network of hospitals is central to the maximization of revenue.

**B.     The Defendant, Community Health Systems, Inc. ("CHS")**

27.     Defendant Community Health Systems, Inc. ("CHS") is a multi-billion dollar Delaware for-profit corporation whose principal executive offices are located at 4000 Meridian Boulevard, Franklin, Tennessee 34108. CHS transacts business throughout the United States, including within the Middle District of Tennessee. CHS was incorporated in 1979, and the

6

company has been publicly traded on the NYSE under symbol "CYH" since June 9, 2000. It is the largest publicly-traded hospital company in the United States. CHS reported $13.6 billion in net revenues in 2011, 7.9% from 2010. The company reported net revenues of $12.9 billion for 2010.

28.     Through its affiliates, Defendant CHS owns, operates or leases, as of December 30, 2011, 131 hospitals in 29 states, totaling approximately 19,695 licensed beds. In 65 percent of the markets served, CHS-affiliated hospitals are the sole provider of healthcare services. Through its subsidiary Quorum Health Resources, LLC, Defendant CHS provides management and consulting services to approximately 150 independent non-affiliated general acute care hospitals located throughout the United States.

29.     CHS's current facilities include 49-bed Martin General Hospital in Williamstown, NC (since November 1998), and more than 126 other facilities across the United States: Alabama (9), Alaska (1), Arizona (4), Arkansas (8), California (3), Florida (2), Georgia (2), Illinois (8), Indiana (9), Kentucky (3), Louisiana (3), Mississippi (2), Missouri (2), Nevada (1), New Jersey (1), New Mexico (6), Ohio (4), Oklahoma (3), Oregon (1), Pennsylvania (14), South Carolina (6), Tennessee (11), Texas (17), Utah (1), Virginia (3), Washington (2), West Virginia (3), and Wyoming (1). Upon information and belief, CHS also operates physician clinics to support these facilities. As of August 2010, Defendant CHS's facilities included three of the top 25 most profitable hospitals in the country, including its 235-bed Dothan, Alabama facility, which was ranked No. 1, and its 432-bed Lutheran Hospital in Fort Wayne, Indiana, which was ranked 11th.

30.     As of December 2011, CHS had approximately 66,000 full-time employees, and 22,000 part-time employees, and employed 8,000 union members. Most of the physicians who staff CHS hospitals are not CHS employees. They are independent contractors who are usually staff members of other hospitals. As of December 2011, CHS directly employed only approximately

7

2,000 physicians at its hospitals.

31.     CHS believes that its "non-urban hospitals are generally able to obtain higher operating margins than urban hospitals" due to the following "factors contributing to a non-urban hospital's margin advantage:...fewer patients with complex medical problems; a lower cost structure; limited competition; and favorable Medicare payment provisions."

32.     CHS states that "a non-urban hospital's lower cost structure results from its geographic location, as well as the lower number of patients treated who need the most highly advanced services." CHS also notes the limited competition among non-urban hospitals which "are generally sole providers or one of a small group of providers in their markets." CHS states that it believes "that non-urban communities are generally characterized by a high level of patient and physician loyalty that fosters cooperative relationships among the local hospitals, physicians, employees and patients."

33.     CHS represents in its financial reports that "Medicare has special payment provisions for 'sole community hospitals'," that "[u]nder present law, hospitals that qualify for this designation can receive higher reimbursement rates," and that [a]s of December 31, 2011, 45 of the CHS hospitals were "sole community hospitals." CHS receives a substantial portion of its revenues from the Medicare and Medicaid programs. CHS reports that in 2011 Medicare accounted for 26.8% of CHS's hospital net revenue. Medicaid accounted for 9.7% of CHS's hospital net revenue for year end 2011.

1.     **Corporate Structure of Defendant CHS**

34.     Since 1997, CHS has been led by Chairman of the Board, President and Chief Executive Officer (CEO), Wayne T. Smith.  In 2009, Mr. Smith's compensation package totaled $17.8 million, up from $10 million in 2008.

8

35.    CHS's executive leadership also includes an Executive Vice President and Chief Financial Officer, W. Larry Cash. CHS-affiliated hospitals are managed by five division-level executive groups, each led by a division president and operations team.

### a.    CHS Division Executives Direct Hospital Management

36.    CHS leadership is comprised of corporate officers (executive leadership, senior division operations leadership, senior corporate leadership, and corporate officers) as well as the Community Health Systems Professional Services Corporation management team (which operations includes leadership for Divisions I through V).

37.    Persons who hold leadership positions at CHS are employed by Community Health Systems Professional Services Corporation, but they may also be an officer of the parent company (CHS) or hold officer and/or director positions with subsidiary corporations.

### b.    CHS'S Professional Services Corporation Management Team

38.    The five CHS division-level executives are: David L. Miller, President, Division I Operations; Michael T. Portacci, President, Division II Operations; Martin D. Smith, President, Division III Operations; William S. Hussey, President, Division IV Operations; and Thomas D. Miller, President, Division V Operations. In 2009, CHS division-level presidents earned between $2.3 million and $5 million annually. The division operations teams provide CHS hospital CEOs with guidance, support and expertise in almost every area of hospital management. CHS hospital CEOs can also give direct input to the corporate office through their division's team.

39.    CHS adheres to operating philosophies that include standardized and centralized operations to improve "profitability and efficiencies," and to increase operating margins. CHS has "also improved margins by implementing standard programs with respect to ancillary services in certain areas, including emergency rooms. Beginning when a patient presents to the

9

hospital, CHS conducts "ongoing reviews" of patient care and closely monitors cases "to prevent delayed service or inappropriate utilization of resources."

### 3. CHS Emergency Room Initiatives to Optimize Revenues Include Pro-MED Systems

40. Defendant CHS highlights in its financial statements the significance of Emergency Room services and initiatives. CHS recognizes that "[a]pproximately 55% of our hospital admissions originate in the emergency room…we systematically take steps to increase patient flow in our emergency rooms as a means of optimizing utilization rates for our hospitals."

41. CHS's efforts in recent years to expand services and to "capture a greater portion of the healthcare spending in [its] markets," focused, in no small measure, on its emergency rooms. CHS reports that its efforts to expand services include diagnostic testing equipment and "additional and renovated emergency rooms." For example, in 2009, CHS spent $260.4 million on projects which included new emergency rooms and other projects which "improved various diagnostic and other inpatient and outpatient service capabilities."

42. CHS also employs an array of consultants at its corporate headquarters to assist the hospitals in their development of targeted services, including emergency, critical care, and hospitalist services.

43. CHS states that a component of its upgraded emergency rooms "is the implementation of specialized computer software programs designed to assist physicians in making diagnoses and determining treatments…[in order to benefit] patients and hospital personnel by assisting in proper documentation of patient records and tracking patient flow. It enables our nurses to provide more consistent patient care and provides clear instructions to patients at time of discharge to help them better understand their treatments." The specialized software that Defendant

10

CHS uses in its Emergency Room is developed and implemented by Pro-MED Clinical Systems, LLC.

44.   During quarterly Earnings Calls conducted throughout 2008 with Wall Street investment firms, CHS CEO Wayne Smith touted the use of the Pro-MED system as an improvement to its emergency rooms that is in place at virtually all CHS hospitals. CEO Smith also discussed Pro-MED in the context of CHS's emergency room admission rates and the "couple of points spread" between CHS and its competitors.

45.   CHS also reported to Wall Street analysts during Earning Calls that increased volumes at CHS facilities in the third quarter of 2008 were based on "physician recruitment and better management of emergency services."   One key tool that CHS uses to increase utilization of services is Pro-MED, which CHS describes as "a computer-accessed diagnostic tool that helps doctors assess a patient's condition, formulate a diagnosis and suggest a course of treatment."

46.   CHS's reliance on Pro-MED systems to increase utilization of hospital services across the CHS network of hospitals is central to the maximization of its corporate revenues

## V.   BACKGROUND ON FEDERAL & STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A.   Medicare Program

#### 1.   Medicare Covers Only Medically Necessary Services

47.   In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).   Medicare now has four parts: Part A; Part B, Part C (managed care plans), and

11

the recently enacted Part D (prescription drug) Program.

48.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care. Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, including emergency care. Part B helps pay for covered health services and supplies when they are medically necessary. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

49.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

50.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, medically necessary. Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act, establish that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10. Regardless of the rules governing the particular type of care, in order for the federal government to cover Medicare Part A, Medicare Part B, or a Medicare Part C plan to provide coverage, all care must be "medically necessary."

51.     Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or

12

treatment of a medical condition must meet the standards of good medical practice in the local area.

52.     The severity of a patient's condition is directly related to Emergency Room charges submitted by hospitals to government-sponsored health care programs. Patient acuity impacts both outpatient Emergency Room care, as well as inpatient care for ER patients who are admitted to the hospital for in-patient care. There are various items that can increase the reimbursement sought by the hospital for the facility side of emergency care: the severity of the patient's illness or chief complaint; care rendered by the emergency room nurse, whether diagnostic tests or procedures are performed in the ER; the care documented by the emergency physician; and whether a consultant is called to examine the patient.

### 2.     Medicare Coverage for Hospital Emergency Room Services

53.     Emergency Room services are considered outpatient care. Charges for an ER visit usually have at least two separate components: facilities charges paid to the hospital and professional charges paid to the physicians who treat the patients.

54.     First, Medicare Part B covers the charge by the hospital for the emergency room itself. Medicare Part B pays the full Medicare-approved amount, except for a patient co-payment, which is the responsibility of the Medicare recipient.

55.     The majority of hospital outpatient services (and certain Medicare Part B services that are furnished to hospital inpatients with no Part A coverage) are paid by Medicare on a Prospective Payment System ("PPS") basis.

56.     ER charges are based on APCs or "Ambulatory Payment Classifications," the government's method of paying for facility outpatient services for the Medicare program. This is analogous to the Medicare Part A prospective payment system ("PPS") for hospital inpatient care ("Diagnosis Related Groups" or "DRGs"), discussed below. Ordering additional diagnostic studies

13

can lead to a greater severity of care, which would impact the hospital's charge based on the APC.

57.    Medicare considers patients kept in the hospital (usually for 23 hours or less) for observations as receiving "outpatient" services. Medicare Part B covers hospital care for observation patients based on lower outpatient APCs, rather than the higher rates paid for inpatient services under Part A.

58.    Medicare may also pay the hospital a separate fee (in addition to the PPS payment based on the APC) for specific outpatient services, including clinical diagnostic laboratory services and medical services received in the ER (such as X-rays, or EKGs). For these services, Medicare Part B pays based on fee schedules, and hospitals are paid 80 percent of the Medicare-approved amount.

59.    The emergency physician who cares for a patient in the ER usually bills the patient separately for his or her professional services. Medicare Part B pays 80 percent of the Medicare-approved amount for the doctor's services. The remaining portion is paid by the patient or by a Medicare supplemental insurance policy.

### 3.    Billing for Inpatient Care for Patients Admitted to the Hospital through the Emergency Room

60.    The Medicare Part A program provides payment for inpatient hospital services under a prospective payment system (PPS). Under the inpatient PPS, hospitals are paid a prospectively-determined fixed amount for each hospital discharge. The fixed payment amount per inpatient discharge is based upon each patient's diagnosis related group, or DRG.

61.    The DRG assigned to each admitted patient is based on his or her primary admitting diagnosis. The payment rate for each DRG is based on the estimated intensity of hospital resources necessary to treat the average patient with that particular diagnosis. CMS bases Medicare's DRG

14

payment rates on national average costs, not the actual costs incurred by a hospital to provide care.

62. For patients admitted from a hospital clinic or ER, there is no APC payment to the hospital (no separate facility charge) for the outpatient services provided in the ER. The facility charge is limited to the Medicare reimbursement to the hospital under inpatient DRG methodology.

63. As with outpatient charges, inpatient care also involves both facilities charges by the hospital and professional fees by physicians. The hospital bills Medicare under Part A, based upon the DRG assigned to the patient's primary admitting diagnosis. The physician who treats the patient during the admission also bills Medicare Part B. The patients themselves may be responsible for payments not covered by other insurance.

**B.** **The Medicaid Program**

64. Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people. Medicaid is a cooperative federal-state public assistance program which is administered by the states.

65. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, the federal government provides approximately 50% of the funding for Medicaid programs in Florida, Georgia, Oklahoma, Tennessee, and Texas. The remaining funds are provided by the state. For example, for North Carolina, the federal government provided 55.2% of the funding for Medicaid in 2008. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

15

66. While Medicaid reimbursement for emergency room care varies by state, there is generally a reimbursement to the hospital for the outpatient services provided, and a separate reimbursement for laboratory services and radiology services performed in the ER.

67. Like the Medicare Program, Medicaid only covers services or supplies that are necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area.

## C. Other Federal Health Care Programs

68. In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of emergency care and in-patient hospitalization under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

69. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

## VI. APPLICABLE LAW

### A. The Federal False Claims Act

70. The federal False Claim Act (federal FCA) provides, in pertinent part:

    (a)    Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or

16

used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1)(A), (B) and (C).

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

**B.    The Federal Anti-Kickback Statute**

71.    Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. § 13207b(b), is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

72.    When an entity pays kickbacks to a doctor in order to induce him/her to refer or recommend patients to the entity for goods and/or services, it fundamentally compromises the integrity of the doctor-patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon physicians to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program. As a condition of its reimbursement, government healthcare programs require that the physicians must render their services without the conflict inherent in receipt of a kickback.

73.    Many states, including those states identified as Plaintiffs herein, have enacted similar prohibitions against illegal inducements to health care decision-makers.

74.    The federal Anti-Kickback Statute and analogous state laws make it a crime to

17

knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

     (1)    to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

     (2)    to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1) and (2).

75.    The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

76.    Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. § 1320a-7b(b)(1).

77.    The federal Anti-Kickback Statute has been interpreted by the federal courts to cover any arrangement where <u>one</u> purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Proof of an explicit *quid pro quo* is not required to show a violation of the Anti-Kickback Statute.

78.    A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded (i.e., not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

79.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

18

80. HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See, 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection. None of the practices at issue here meet these safe harbor regulations.

81. Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

82. The Anti-Kickback Statute expressly provides that claims that arise from a kickback scheme are false and violate the False Claims Act. No further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

83. It is the very fact that the health care decision-maker has accepted a kickback that per se renders not payable the claims for goods or services as to which the kickback was given, not whether the decision-maker would have otherwise selected that good or service (here, ER, out-patient and in-patient services provided by CHS's facilities and/or physicians).

84. Moreover, as a prerequisite to participating in federally-funded health care programs, providers must certify (expressly or, through their participation in a federally-funded health care program, impliedly) their compliance with the federal Anti-Kickback Statute.

85. As a prerequisite to participating in the various state Medicaid programs, providers must certify (expressly or, through their participation in the state-funded health care program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.

19

86.    Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, i.e., that it is properly payable.    Consequently, if a hospital pays a kickback to induce the referral or recommendation of a patient for in-patient or out-patient services and related goods, it renders false the submitter's implied or express certification of compliance that the resulting claim meets the requirements of the Anti-Kickback Statute.

## VII.    RELATOR MASON OBSERVES HMA'S USE OF ER PROGRAMS DEVELOPED BY PRO-MED CLINICAL SYSTEMS, LLC

87.    HMA has adopted and proliferated nationwide corporate practices and systemic ER schemes involving the use of Pro-MED ER products and systems, which are aimed at generating significant fraudulent revenues from charges for unnecessary diagnostic tests and hospital admissions.

### A.    HMA's Corporate Leadership Structure

88.    HMA is led by President and Chief Executive Officer, Gary Newsome. Immediately before he took over at HMA, Newsome was an executive at Defendant CHS from 1998 until 2008.

89.    When Newsome arrived at HMA in September of 2008, he also joined HMA's Board of Directors.  Newsome is based at HMA corporate headquarters in Naples, Florida. Before Newsome, HMA was led by President and Chief Executive Officer Burke Whitman.

#### 1.    Relator's Knowledge of ER Programs Developed by Pro-MED Clinical Systems, LLC

##### a.    Pro-MED Clinical Systems, LLC

90.    Pro-MED Clinical Systems, LLC ("Pro-MED") is a privately-held Florida for-profit limited liability corporation whose principal place of business is located at 8641 N.W. 51 Place,

20

Coral Springs, Florida 33075. Pro-MED transacts business throughout the United States. Founded in 1991, Pro-MED reports that it is the largest provider of comprehensive Emergency Department systems in the United States, currently serving over 170 hospitals nationwide.

91.     The vast majority of the 170 hospitals nationwide that use Pro-MED Emergency Department systems are owned, operated, managed or leased by Defendant CHS (129 hospitals) and by HMA (55 hospitals). Upon information and belief, Pro-MED is used extensively, and nearly exclusively, at HMA and Defendant CHS's facilities.

**b.     HMA Implements Pro-MED Systems: Patient Manager, Complaint Test Mapping (Practice Guidelines), and Case Management Software**

92.     In addition to its agreement to provide professional medical services required of the ER, MEMA also agreed to provide an ED Medical Director (a/k/a "Chief of Services") for the Lake Norman emergency room who was board certified in emergency medicine, internal medicine or family practice. The ED Medical Director is supposed to serve as the official link between the MEMA emergency physicians and the hospital. From 1997 until November 1, 2010, Relator Mason fulfilled MEMA's ED Director obligations at Lake Norman.

93.     The MEMA ED physicians bill patients and third-party payors for their professional fees, while HMA's hospital, Lake Norman, bills for the ER facilities, equipment, supplies, and support services provided by the hospital. In addition, for patients admitted to the hospital, HMA and/or its subsidiaries bill for both professional fees and facilities' fees. The original three-year contract between MEMA and Lake Norman contained an automatic renewal provision, with either party having the right to terminate the agreement upon six (6) months prior written notice.

94.     When HMA acquired Davis Regional in 2000, MEMA executed a professional services agreement with HMA's Davis Regional. This MEMA/HMA agreement became effective

21

on November 1, 2000. The original three-year term automatically renewed, with either party having the right to terminate the agreement upon 120 days prior written notice.

95.    Like the MEMA agreement at Lake Norman, MEMA had the exclusive right to staff physicians in the Davis Regional ER 24/7 and to provide medical services required of the ER. As with the contract at Lake Norman, MEMA services at Davis Regional included providing both care to ER patients and a record of that care.

96.    MEMA agreed to provide a Medical Director for the Davis Regional ER who was board certified in emergency medicine, internal medicine or family practice. As with the Lake Norman contract, the Medical Director for the Davis ED served as the official link between the ER physicians and the HMA hospital.

97.    Another MEMA physician, Dr. Folstad, served as the ED Medical Director at Davis from 2000 until January of 2008, when he became President of MEMA. At that time, another MEMA physician, Steve Greer, MD, FACEP, became the Davis Regional ED Medical Director, and he continued in that position until MEMA was discharged on September 1, 2010.

98.    In keeping with recommendations by the American College of Emergency Physicians ("ACEP"), MEMA physicians do not have privileges to admit patients to either Lake Norman or to Davis Regional. Instead, the MEMA physician, as the ED patient's treating physician, contacts an attending physician to discuss a patient for whom the MEMA physician recommends admission. The ED patients are primarily admitted to the HMA facilities by physicians with admitting privileges, including private physicians and physicians employed by, or under contract with, HMA to render in-patient care.

99.    When Dr. Mason took over the role of ED Medical Director at HMA's Lake Norman (in 1996), he understood that HMA was using a billing program called "Pro-MED." At

22

that time, MEMA physicians at Lake Norman and Davis Regional, including Relator Mason, used simple dictation to complete the physician record. Later, they used a paper physician record called T-System to document their care in patients' charts. MEMA used this T-system until 2009, when HMA mandated that all emergency physicians use the Pro-MED physician EMR.

100. Over the course of his tenure at HMA facilities, Relator became familiar with Pro-MED's products (ER software) and related consulting services, which Pro-MED provided to HMA and its more than 50 facilities throughout the country.

### c. Pro-MED's ER Software Used at HMA's Hospitals

101. Pro-MED provides both products (ER software) and related consulting services to HMA and its facilities throughout the country. HMA employs Pro-MED "emergency room clinical pathway support service" in all HMA hospitals to increase the utilization of hospital emergency, out-patient and in-patient services. Pro-MED provides the ER clinical pathway support service to HMA facilities through the following software and/or applications: Patient Manager; Complaint Test Mapping (practice guidelines); and Case Management software.

102. Pro-MED's Patient Manager program provides ER staff with automated status boards to monitor the patients' activities from presentation to the ER through disposition. During this process, Pro-MED's Patient Manager uses color-coded alerts to highlight "high risk" patients who should be considered for admission. The Pro-MED Patient Manager includes an automated triage process.

103. Pro-MED touts its Patient Manager program as a means to "maximize the hospital's revenue potential." The Pro-MED Patient Manager includes applications to capture both the ED nurse's record and the ED physician record, both of which are included in the Pro-MED electronic medical record ("EMR").

104. HMA and Pro-MED have collaborated to implement the Pro-MED Patient Manager software, including the Pro-MED nurse EMR, in HMA EDs throughout the country since at least 2004. By October of 2006, approximately half of the HMA ER facilities also utilized the Pro-MED physician EMR.

## PRO-MED COMPLAINT TEST MAPPING (PRACTICE GUIDELINES) SOFTWARE

105. Pro-MED's Complaint Test Mapping practice guidelines, ("CTM guidelines") are test sets which are automatically ordered by nurses in the ER based on the ER patient's chief presenting complaint. Pro-MED CTM, as implemented at HMA, are discussed at length below.

106. Upon information and belief, the CTM guidelines are part of the Pro-MED Patient Manager application. Pro-MED claims that it developed CTM guidelines "in consonance with criteria formulated by the American College of Emergency Physicians, and other recognized professional sources that can be customized to each hospital's individual needs and resources."

107. Pro-MED developed the CTM guidelines used in EDs throughout the HMA network specifically for HMA. EmCare participated in the development of the HMA CTM (practice) guidelines. Pro-MED CTM guidelines have been in place at EDs throughout the HMA network since at least October 2003.

## PRO-MED CASE MANAGEMENT SOFTWARE USED AT HMA TO INCREASE ADMISSIONS: QUALITY REVIEW AND QUALCHECK

108. Pro-MED reports that its Case Management software "[a]lerts clinicians when a patient meets criteria for case management consultation – before they are discharged" by providing "prompts for required documentation to support deserving admissions." Pro-MED's Quality Review and QualCheck programs recommend that patients be admitted when they do not actually qualify for an acute care admission through the ER.

24

109. Since 2003, HMA has employed a Pro-MED program called "Quality Review" by which ED patients were selected, based on very low threshold for admission, to receive closer scrutiny by ED physicians and/or ER management. Upon information and belief, "Quality Review" standards were selected by HMA and incorporated in the Pro-MED software.

110. Quality Review selection is triggered by information in the chart, including the nurse's EMR, which could include, a vital sign, a complaint, a test value, etc. For example, where the nurse EMR includes a notation that a patient has "the worst headache of their life," shortness of breath, or blood in the urine (a common symptom of a bladder infection) this would result in a Quality Review indicator for admission. Quality Review patients are selected in real time, before the patient is discharged from the ER. When a Quality Review patient is not admitted, the emergency physician and/or ER management would have to justify the discharge. The purpose of the Quality Review is to increase admissions. The HMA "Quality Review" practice could be employed at any HMA facility, regardless of the software used by the physician to document the patient's chart.

111. In addition, Pro-MED's Case Management software prompts ER physicians at HMA hospitals to both consult an attending physician and to consider admission for <u>every patient 65 and over</u>.

<u>QUALCHECK</u>

112. In October 2006, Pro-MED presented HMA with Pro-MED QualCheck, a software enhancement to the Pro-MED Case Management program. Pro-MED represented to HMA that QualCheck could assist the ED physician and the hospital by using Medicare or another index as a quality and treatment check to identify patients, prior to discharge, who meet criteria for admission or further treatment. Pro-MED representatives told HMA that, to use Pro-MED QualCheck, the ED

25

must first employ Pro-MED's physician EMR.

113. The Pro-MED QualCheck application scours the patient's electronic medical record, including the emergency physician's EMR, for indications that the patient met pre-set admission criteria selected by HMA. QualCheck then identifies patients "in real time" (while they are still in the ER) who meet selected admission criteria and alerts the emergency physician with an electronic prompt. When the emergency physician concludes that admission is not medically necessary, the emergency physician must override the QualCheck prompt to complete the patient record. The physician is expected to document the reason for the override. A second prompt also appears to document for critical care for those patients meeting HMA's corporate criteria.

114. Upon information and belief, Pro-MED's QualCheck admission parameters for HMA facilities are not based on medical necessity. QualCheck's admission parameters are based on the <u>minimum</u> standards that could justify admission and coverage under federal and state healthcare programs.

115. The parameters set by HMA and Pro-MED for the QualCheck software to prompt the ED physician to consider admission are quite broad, and QualCheck prompts the physician to admit patients for whom in-patient care is not necessary. For example, QualCheck flags patients for admission whose diagnostic studies are negative. QualCheck even flags patients who cannot be admitted (transfer patients and those who have passed away).

116. By October 2006, approximately half of HMA hospital EDs used the physician EMR function of the Pro-MED Patient Manager program. Around this same time, on Pro-MED's recommendation, HMA employed the QualCheck program in many of the HMA hospitals where the Pro-MED physician EMR was already in place.

117. In late 2008, after Newsome arrived at HMA, all of HMA hospital EDs were

26

required to use the Pro-MED physician EMR component, in great part, to facilitate the use of QualCheck software to cause emergency physicians to recommend admission for more patients.

## 2. Patient Flow through HMA Emergency Rooms Using Pro-Med Systems

118. The processes employed at HMA facilities for moving patients through the ER are automated and designed to proactively facilitate Pro-MED software programs employed system-wide by HMA to track both patient progress and full utilization of hospital services.

119. The process for moving a patient through the ER, sometimes referred to as the "throughput," involves moving the patient from presentation at the ER to disposition from the ER.

120. A patient arriving at an ER using Pro-MED Systems, including at HMA's facilities, is first assessed by a hospital-employed triage nurse and not a physician. At HMA's Lake Norman and Davis Regional ERs, the triage nurses are often the least experienced RNs in the department. HMA's triage nurses are neither physician's assistants ("PAs") nor nurse practitioners ("NPs").

121. Under the Pro-MED System implemented at HMA, the triage nurse uses information hastily gathered from the patient to determine the patient's so-called "chief presenting complaint." The ER triage nurse, without physician assistance, selects the patient's chief presenting complaint from a computerized drop-down menu in the Pro-MED Patient Manager program.

122. Selection of the chief presenting complaint, by a non-physician nurse, immediately triggers the Pro-MED CTM guidelines program. This protocol electronically orders a battery of diagnostic studies which correspond to the nurse (not physician) selected putative chief complaint.

123. Most patients present at emergency rooms with multiple symptoms or complaints. Determining which is the patient's primary or "chief complaint" upon which to base the diagnostic studies imposes an unreasonable burden on a time-challenged triage nurse.

124. HMA's procedures, which require triage nurses to determine the chief complaint and

27

to order diagnostic testing without physician input, violates the North Carolina Nurse Practices Act, which prohibits a nurse, other than a Nurse Practitioner or Physician's Assistant, from ordering tests.

125. Similar statutes, in virtually every state, reserve for advanced nurses (nurse practitioners and physicians assistants) acts of diagnosis, including ordering diagnostic studies. HMA's procedures requiring triage nurses to order tests violate these statutes.

126. HMA's practices of using triage nurses to initiate diagnostic testing is also medically inappropriate based on the nurse's level of training and experience.

127. Therefore, the patient's diagnostic studies are ordered and initiated in HMA hospital EDs by the ER triage nurse based on his/her determination of the patient's chief complaint. HMA's ER process requires that triage nurses order CTM tests before the ED physician has seen the patient. After triage, the patient either returns to the waiting room, or is taken to an available ED exam room, but has not yet been examined by the ED physician.

128. Once a test is ordered at triage using the Pro-MED CTM, it is confirmed in the Pro-MED system with a host time. Once the Pro-MED CTM program sets the ER testing process in motion, the HMA staff immediately initiates diagnostic studies wherever the patient is located (i.e., the patient may be taken from the waiting room to x-ray, or to a chair in the treatment area to have blood drawn). At times, when the emergency physician enters the exam room, the patient is not there because they have already been taken for diagnostic studies which have previously been ordered by nurses.

129. Once the ER patient is in the exam room, the emergency physician conducts a comprehensive patient assessment and uses his or her own medical judgment to determine the patient's chief complaint. The emergency physician's determination often does not correspond to

28

the chief complaint selected by an HMA triage nurse.

130. The emergency physician will then review the diagnostic studies that have been ordered through the Pro-MED CTM guidelines. If the chief complaint entered by the nurse at triage does not accurately represent the patient's medical condition, additional relevant tests will need to be ordered by the physician. Where unnecessary lab tests have been initiated, the emergency physician must wait for these results. Often the CTM guidelines tests are not appropriate, and Pro-MED does not improve the efficiency or efficacy of the patient care.

131. The Pro-MED CTM and Patient Management programs do not take into consideration that some patients will quickly be seen by the emergency physician, who can then determine from the outset which diagnostic studies are appropriate.

132. Once the diagnostic studies are complete, the ED physician makes a diagnosis, provides treatment, and arrives at a disposition for the ER patient. At times, the ED physician will consult with the patient's private physician, another attending physician, or a specialist to discuss follow-up out-patient treatment or possible admission.

133. While the ED physicians at HMA facilities can write orders to discharge patients or to transfer them to another facility, emergency physicians at HMA hospitals typically do not have admitting privileges. Thus, when the emergency physician, considered the ED patient's treating physician, contacts a hospitalist or other attending physician with admitting privileges, it is to recommend retaining the patient at the hospital for in-patient treatment.

134. Therefore, the ED physician can arrive at one of three possible dispositions for the ED patient: discharge to home; transfer to another facility; or a call to an attending physician to discuss admission to the hospital or other out-patient follow-up care.

135. A patient can be kept at the hospital for either observation (technically considered

29

out-patient treatment) or admission for in-patient treatment. The orders for these last two dispositions (observation or admission) are written by a physician with admitting privileges (HMA hospitalists, an attending member of the medical staff, or a patient's private attending physician).

136.    Following the patient's disposition, the HMA hospital compiles the billing record for its own charges and for the professional component. The hospital provides the emergency physician group with a copy of the ED chart in order to facilitate billing for the professional side of the ER charges.

### 3.    HMA's Billing Process, Including Providing a Billing Record to MEMA

137.    Mechanically, Lake Norman and Davis Regional processed the patient records slightly differently. At Lake Norman, Relator Mason observed that a clerk in the ER would make four copies of the physician record (the paper T-sheet): one was kept in the ER, one went to medical records, one was provided to MEMA for billing, one was used by the Lake Norman billing department for coding and submission. Someone at Lake Norman then printed the other components of the billing record and scanned the package to MEMA's billing company with a face sheet that listed the documents attached. At Davis Regional, the clerk who did the coding for the hospital's ER charges also made copies of the physician record (the paper T-sheet) for MEMA. This was not done in the hospital billing department.

138.    Pursuant to the contracts between MEMA and Lake Norman and Davis, approximately five days after discharge, HMA provided MEMA with documentation of the patient's demographic, insurance, and clinical information (the chart) which was scanned and electronically transferred by HMA to MEMA's billing company.

139.    The clinical information (chart) which HMA provided to MEMA for billing purposes would include the following components:

30

- Face sheet (identifies the patient name, number, date of service, and practice ("MAD" for Davis Regional and "MAN" for Lake Norman patients);

- Demographics page from the Admission Record;

- Consent to Conditions of Treatment and Admission;

- Discharge Instructions;

- Initial Assessment Form, which provides triage information, including triage time and chief complaint ascribed at triage;

- Order Procedure Form to be completed by the physician, typically tailored to the type of emergency;

- Emergency Physician record (prior to the EMR being installed in June of 2009, a T-System paper record);

- (Sometimes) Nurse Documentation generated by Pro-MED Clinical Systems, LLC;

- (Sometimes) Order Summary generated by Pro-MED Clinical Systems, LLC, which lists the diagnostic tests (those recommended by HMA's CTM guidelines, the tests ordered in the ER by the triage nurse, as well as those ordered by the physician after he saw the patient), the procedures performed, and the level of care ascribed to the patient visit by Pro-MED;

- (Sometimes) EKG printouts, lab results, etc.;

- (Sometimes) Admission records for patients admitted to the hospital.

140. Both HMA hospitals provided MEMA with a face sheet, admission record, consent to treatment, discharge instructions, initial assessment form (triage record), and the emergency physician's portion of the chart (the T-sheet physician record and Order Procedure Form). However, MEMA received slightly different Pro-MED records from Lake Norman and Davis

31

Regional. From Lake Norman, MEMA typically received the Pro-MED Nurse Documentation report, including a table showing "points" ascribed by Pro-MED to various nursing tasks. The Pro-MED Nurse Documentation report MEMA received from Davis Regional did not include the nursing table of points. However, MEMA did typically receive from Davis Regional a report not provided by Lake Norman: the Pro-MED Orders Summary, which listed the Pro-MED CTM tests, both the true and false tests, noting with a host time which were ordered, as well as any procedures or treatments ordered by the emergency physician. The Pro-MED Orders Summary typically also included an ED Level of Care ascribed by Pro-MED.

141. Upon information and belief, the component records included in the clinical information (chart) which HMA provided to MEMA for billing the professional component of the ER charges was also utilized by HMA to bill the facilities charges associated with the patients' care. The following components of the chart which HMA provided to MEMA are directly relevant to the HMA hospital facilities charges: Initial Assessment Form, (triage information); Nurse Documentation generated by Pro-MED Clinical Systems, LLC (including points table); Order Summary generated by Pro-MED Clinical Systems, LLC; any EKG printouts, lab results, etc.; any appropriate admission records; and/or, Discharge Instructions. At times, HMA supplied MEMA with the same facility patient billing chart and the copy of the chart intended for MEMA's billing company.

142. After the HMA facility codes the patient's chart, it submits a claim to Medicare, Medicaid, or other third-party payors for any facility charges associated with emergency care, in-patient care, or observation. In this claim, HMA certifies to the accuracy and medical necessity of the emergency services rendered, including the tests ordered.

143. Relator understands that the coding of the patient chart and billing were conducted

32

slightly differently at Lake Norman and Davis, but that both facilities relied on the same component records.

144. In addition to HMA's facility charges and the emergency physician's charges, there may be professional charges related to other physicians (including HMA physicians) who render medical care during the patient's hospital stay.

### 4. HMA's "Quality" Improvements Using Pro-MED Software and Services – Creating Revenue through Unnecessary Tests and Admissions

145. Some time before October of 2003, HMA embarked on a campaign to increase admission to its facilities. Upon information and belief, HMA's campaign focused on selecting patient charts based on very low admission thresholds, flagging them for close scrutiny by the ED physician, and requiring that emergency physicians admit a minimum number of ER patients.

146. Since at least 2003, with active participation by Pro-MED, HMA has directed the treatment of ER patients through executive fiat (corporate selection of diagnostic tests and minimum admissions levels), and insidiously interfered with the emergency physicians' independent judgment of the appropriate and medically necessary care for the ED patient.

147. HMA and Pro-MED have dedicated considerable time, effort and resources to implement Pro-MED ED software in HMA facilities nation-wide. These efforts to automate the delivery of service in HMA EDs and to direct patient care from HMA's corporate headquarters reveals a scheme to illegally increase and maximize hospital revenue.

148. HMA touts its efforts to drive ER volumes through executive mandates on the number of diagnostic tests ordered and minimum ER patients' admission rates, as promoting the delivery of "consistent and high-quality care." The true purpose of HMA's corporate testing and admissions benchmarks is to illegally pressure emergency physicians and nursing staff at HMA's

33

facilities to generate greater revenues for HMA through hundreds of millions of dollars in unnecessary hospital services.

**5. HMA Implements Pro-MED CTM Guidelines to Generate Illegal Charges from Unnecessary ER Tests – Not to Improve Patient Satisfaction - and Interfering with the Physician's Delivery of Appropriate Care**

149. As originally formulated for HMA, the Pro-MED CTM guidelines program included 700 tests which correspond to 515 chief (presenting) complaints. These tests guidelines are not evidence-based standing orders developed to enhance patient care. The CTM guidelines were developed to drive revenues for HMA.

150. In addition to the increased revenues from the tests themselves, upon information and belief, HMA derives additional facilities' revenues based on inflated severity of care justified by the unnecessary tests as well as from charges for the tests themselves.

151. Sometime before October of 2003, HMA installed the Pro-MED Complaint Test Mapping software in all of its hospitals and established a corporate benchmark requiring that ER triage nurses order, and emergency physicians not cancel, a minimum number of the tests included in the CTM guidelines.

152. Dr. Riner stated in a November 4, 2009 email that, as he understood it, Terry R. Meadows, MD (EmCare Regional CEO, Southeast Region, and EmCare Senior Vice President of Systems Relations), and Michael Wheelis, MD, an EmCare physician from Natchez Community Hospital, developed the CTM guidelines used by HMA.

153. The CTM guidelines, as developed by HMA and Pro-MED, divide the diagnostic studies into two groups. HMA claims that the first group, those tests marked "Y" or "true" are basic tests "intended to ensure a consistent high quality work up for all patients…and to decrease the "door to workup time and decrease the length of stay…thereby decreasing the number of LWOT's

34

(patients who left without treatment) and increasing patient and family satisfaction." The "true" tests are the ones that the nurses are expected to order. They are automatically ordered by the triage nurse who selects the chief complaint. The ordering of tests by the triage nurse, prior to the emergency physician's authorization, violates myriad state nursing licensure laws.

154.    HMA uses Pro-MED software to track each "Y" test (those ordered by triage nurses before the ED physician speaks with the patient). The percentage of guidelines tests is calculated by dividing the number of Y tests not cancelled by the ED physician by the number of tests initially ordered by the triage nurse using Pro-MED's CTM program. Interestingly, HMA has never criticized any ED for ordering too many tests. This is due, perhaps, to the fact that HMA's Pro-MED system does not even track the "extra" tests ordered by the ED physician after he examines the patient (these are the tests marked "N" or "false" on the CTM guidelines).

155.    Amazingly, from at least 2003, the HMA national corporate benchmark for ordering CTM guidelines tests was set at 80% or greater. In 2010, HMA raised this corporate benchmark to 85% with no change in the patient population it was serving. No evidence-based medical reason exists for either the initial or the increased testing benchmark.

156.    HMA, through this explicit corporate benchmark for guidelines tests ordered, pressures the ED physician not to cancel CTM guidelines tests, even if the physician concludes that they are not medically necessary.

157.    HMA and Pro-MED designate other tests as "N" or "false" tests, those which "should be considered once the physician examines the patient." These are not automatically ordered by the triage nurse using CTM guidelines program. Although HMA has a record of the tests ordered by the physician after he/she actually assesses the patient and determines the chief complaint, there is no ED performance metric associated with these tests. In addition, the tests

35

ordered by the emergency physician do not count toward meeting HMA's CTM guidelines. HMA's implementation of Pro-MED CTM guidelines interferes with the emergency physician's medical necessity determination because the tests are ordered by the triage nurse before the physician has seen the patient.

158. When the triage nurse automatically orders diagnostic tests for ER patients, they cannot accurately reflect the emergency physician's determination of medical necessity. When unnecessary, irrelevant, or excessive tests are ordered, the ED physician must manually override the Pro-MED software in an attempt to cancel CTM guidelines tests which, based on the physician's assessment of the patient, are not medically necessary.

159. As the Pro-MED program is designed, once the diagnostic test has been ordered by the triage nurse using Pro-MED CTM, it cannot be cancelled or deleted within the Pro-MED program. The test order must be deleted from the hospital's own computer system. At HMA's Lake Norman and Davis Regional, deleting or canceling a test ordered through Pro-MED CTM required that the physician create a paper record canceling the test and then physically deliver that record to the appropriate department (the lab or radiology). Thus, trying to manually cancel tests initiated by the triage nurses using Pro-MED CTM program was time consuming -- and often futile.

   a. **Limited Flexibility – Before October 2008, Some EDs Edit HMA Corporate Test Guidelines**

160. Before 2008, a few HMA hospital EDs were accorded some flexibility in employing the CTM guidelines. In these limited situations, the local hospital CEO permitted the emergency physicians to edit the Pro-MED CTM guidelines to remove the excessive test sets. In other words, the ED Director could locally edit the "Y" tests to eliminate unnecessary tests which otherwise would have been ordered for a patient using HMA's standard CTM guidelines. However,

Case 3:12-cv-00817-GCM   Document 4   Filed 01/09/13   Page 44 of 139

the ED was not permitted to stop the practice of triage nurses ordering tests.

161.    For example, Paul Smith, the CEO at Lake Norman until May of 2008, permitted Relator Mason, the ED Director, to employ "local edits" to HMA's standard Pro-MED CTM guidelines used in Lake Norman's ED. Dr. Mason reduced, as best he could, the CTM diagnostic studies to the bare minimum that might be triggered by the triage nurse's selection of the chief complaint. Before October of 2008, MEMA physicians also edited HMA's standard CTM guidelines used at Davis Regional to leave only what was most likely medically appropriate for the chief complaint listed. Thus, until October of 2008, the MEMA emergency physicians at Lake Norman and Davis Regional avoided ordering many unnecessary tests included in HMA's standard Pro-MED CTM guidelines program.

162.    While Lake Norman and Davis Regional emergency physicians used local edits and other means to reduce the incidents of unnecessary tests, at the other 53 (or more) HMA hospitals, HMA executives exerted control over the CTM guidelines employed in the ED.

163.    HMA, since 1979, through its subsidiary Paintsville Hospital Company, has done business as Paul B. Hall Regional Medical Center. At this 72-bed Medicare and Medicaid approved facility, the ER physicians see 500 patients each week. (The same number of patients visit the Lake Norman and Davis Regional ERs).

164.    When Pro-MED alerted HMA that edits to the CTM guidelines by emergency physicians at HMA's Paintsville hospital caused ED revenues to fall by $300,000 each month, HMA reasserted corporate control over the CTM guidelines tests. HMA instructed Pro-MED to reset the CTM guidelines at Paintsville to HMA's standard CTM guidelines tests. ER revenues at Paintsville immediately returned to their previous levels.

37

### b. HMA's Complaint Test Mapping Guidelines Generate Many Medically Unnecessary Tests

165. While the emergency physician can typically determine the appropriate and necessary work-up quickly when assessing the patient, with mandatory CTM guidelines, unnecessary tests often have been completed by the time the physician first sees the patient.

166. Since at least 2003, HMA's systemic procedures and network-wide use of Pro-MED software has caused the ED triage nurses in its hospitals to illegally order tests, many of which were unnecessary, when applied indiscriminately to every patient with the same nurse-selected chief complaint.

167. Many of the test sets included in the HMA's original (prior to October 2008) Pro-MED CTM guidelines were abusive. From at least 2003 until 2008, HMA's implementation of the original Pro-MED CTM guidelines have caused triage nurses and/or emergency physicians in HMA hospitals to regularly order thousands of excessive and medically unnecessary diagnostic studies, which were billed to government and third party payors.

168. By way of example, for pregnant patients (less than 20 weeks gestation) who present with vaginal bleeding, what should be ordered routinely on each of these patients, all of whom are Medicaid eligible, is a urinalysis and either a <u>Qualitative</u> B-HCG or a Quantitative B-HCG. A urinalysis, if performed initially, would promptly differentiate vaginal bleeding from blood in the urine due to a bladder infection. Pro-MED's original (pre-2008) CTM guidelines for HMA facilities does not include a urinalysis.

169. A Qualitative B-HCG is a quick, simple, and inexpensive urine test that tells if the patient is indeed pregnant. HMA's original CTM guidelines have, since at least 2006, called for

38

a Quantitative B-HCG, complete blood count ("CBC"), and Type & Screen. Only the physician should determine whether the Qualitative or Quantitative B-HCG should be ordered based on his or her assessment of the patient. The CBC and Type & Screen are excessive for nearly all of the Medicaid patients whose chief complaint is described as "vaginal bleeding (pregnant less than 20 weeks)." These tests also subject the patients to unnecessary blood draws.

170.    In another example, most patients over age 55 who present in the ER with a chief complaint for abdominal pain, would not need any tests if their history and examination, as reviewed by a physician, are benign. Medical studies show that 50% of all ED abdominal pain is completely benign. Those patients over 55 with abdominal pain who even need tests should receive a complete blood count ("CBC"), complete metabolic panel ("CMP") and urinalysis.

171.    Under HMA's original Pro-MED CTM guidelines, patients over 55 with abdominal pain would have a complete work-up, including the following tests: CBC (complete blood count), CMP (complete metabolic panel), urinalysis, EKG, and amylase. The EKG and amylase are unnecessary.

172.    Another example of the excessive tests ordered by triage nurses using HMA's original CTM guidelines is the patient who presents in the ER with blood in their urine. The most common reason for blood in the urine is a bladder infection. The only medically necessary test for that is a urinalysis. However, people with kidney stones often have blood in their urine. If the triage nurse selects "kidney stone" as the chief complaint, the CTM guidelines orders all of the tests to work up a kidney stone diagnosis, including a basic metabolic panel ("BMP"), complete blood count ("CBC") and a urinalysis ("UA").

173.    HMA states that it uses CTM guidelines "to improve efficiency in the ED by allowing the nurse to order certain indicated tests from the point of triage based on the selected

39

Chief Complaint."

174. The excessive tests ordered using HMA's original (pre-October 2008) CTM guidelines undermine the quality of patient care because the patient experiences unnecessary pain, discomfort, expense and inconvenience attendant to unneeded diagnostic studies. For example, every child less than 90 days old with a fever greater than 100.4 receives blood tests and x-rays. Every child between three and 24 months with a fever between 100.5 and 102.2 would receive blood tests. In addition, unnecessary tests undermine patient satisfaction because the ED staff and physicians are occupied with processing unnecessary tests.

6.    **HMA Imposes Benchmarks to Enforce Adherence to CTM Guidelines**

175. Before October 2003, HMA established 13 corporate benchmarks for ED performance. Not surprisingly, five of the HMA's ED performance benchmarks focus on increasing admissions or the number of diagnostic tests ordered: % of Admissions; % of Total Patients with Quality Review Identified Who Were Discharged; % of Patients with Tests Ordered; % of Guidelines Tests Ordered; % of attendings called. As discussed below, in June of 2005, HMA added additional benchmarks aimed at illegally generating revenues through Medicare ER patients.

a.    **Patients with CTM Tests Ordered**

176. HMA mandated that its ED triage nurses order Pro-MED Complaint Test Mapping (practice guidelines) tests immediately after triage. HMA employed corporate benchmarks to measure nurse performance for ordering tests, and chastised nurses who failed to meet these benchmarks. As explained above, Pro-MED's CTM guidelines are part of the Pro-MED Patient Manager application. HMA imposes two minimum standards for CTM tests ordered for ER patients.

177. The first, "Patients With Tests Ordered" refers to patients who had at least one test

40

ordered "using order entry in Pro-MED." This refers to the % of ER patients for whom the triage nurse orders tests using Pro-MED Complaint Test Mapping. At some point, HMA added the requirement that the triage nurse order CTM guidelines tests within 10 minutes of triage. This meant that CTM could more easily be initiated before the patient is seen by the ED physician.

178.    On June 8, 2007, Pro-MED issued a Performance Review Letter for the ED at Davis Regional. In it, Pro-MED described the "Patients With Tests Ordered" benchmark as: "the total number of patients that had at least one diagnostic study ordered during the emergency visit." Pro-MED went on to claim that use of testing guidelines immediately following triage will "improve patient satisfaction, reduce risks, and reduce the length of stay."

179.    In its report of July 2008, Pro-MED recommended that HMA hospitals: "incorporate the practice guidelines into a policy that clearly outlines the daily utilization, which includes having the nurse begin the workup (order CTM guidelines tests) _immediately following_ triage at a rate of 70% or greater. (Emphasis added.)

180.    HMA's benchmark from October 2003 until 2008 for % of Patients with Tests Ordered was 67%. In July of 2008, Pro-MED consultants suggested that this benchmark be increased to 70% in order to "improve the consistency of the workup."

181.    HMA harassed its ER nurses to order CTM guidelines tests immediately and to advance HMA's other ED benchmarks. Nurses who did not support HMA's efforts, including Tonya Kirby, ER Nurse Manager at Lake Norman, were forced to resign. Joe Vice, RN, an ER nurse at HMA's Anniston, Alabama hospital, was an outspoken critic of HMA's implementation of Pro-MED programs, including CTM guidelines.

b.    **CTM Guidelines Tests Ordered**

182.    The second "tests" benchmark imposed by HMA, as described in Pro-MED's 2007

41

facility report for Davis Regional, measures the % of CTM guidelines tests "identified by complaint type and approved by the medical staff and initiated by the clinical staff." This benchmark actually measures the % of all CTM guidelines tests not cancelled by the ED physician. This benchmark tracks each <u>test</u> cancelled, not each patient for whom CTM guidelines were followed.

183. Although HMA and Pro-MED indicate that the CTM guidelines tests were "approved by the medical staff," Relator Mason is not aware of any HMA policy or procedure before CMO Riner mentioned it in his November 2008 memo. Relator Mason was not asked to present HMA's CTM guidelines to the MEC at Lake Norman or Davis Regional until January 2009, when HMA required the medical staff to approve CTM guidelines tests.

184. HMA's corporate benchmark from October 2003 until 2010 for % of guidelines tests was 80%. In April 2010, HMA increased the CTM "testing guidelines" benchmark to require that ED physicians not cancel a minimum of 85% of tests included in HMA's standard Pro-MED Complaint Test Mapping guidelines.

185. Physicians at many HMA facilities met and exceeded HMA's CTM guidelines benchmark of 80%. These include Dr. Wheelis' Natchez, MS Hospital, which has ordered CTM tests at least 93.5% of the time since March of 2008. Others include: Gafney, Williamson, Barton, Florida; Gasden and Anniston in Alabama; Van Buren, Arkansas; Sebastian, Barton, Haines City, Lehigh Acres, Punta Gorda, Naples, and Key West in Florida; Winder, Georgia; Paintsville, Kentucky; Jackson and Clarksdale in Mississippi; Carlisle, Pennsylvania; Hartsville and Chester, South Carolina; Lebanon, Tennessee; Toppenish and Yakima, Washington; and Williams, West Virginia.

186. Relying on their individual medical judgment as to each unique patient's medical needs, since October 2003, MEMA physicians at Defendant Davis Regional and Lake Norman

42

often did not meet HMA's corporate benchmarks for % of guidelines tests.

### 7. HMA Implements Pro-MED Patient Manager Software, Including Quality Review, Physician EMR, and QualCheck, and Related ED Benchmarks to Generate Illegal Revenues from Unnecessary Admissions to HMA Hospitals

187. Since at least 2003, HMA has employed policies and procedures to illegally increase in-patient admissions and to avoid outpatient observations for patients entering the Emergency Room at HMA's hospitals nationwide.

188. HMA's policies to increase ER admissions and the corporate mandates HMA imposed on emergency physicians illegally interfere with the physicians' independent medical judgment of what is the most appropriate and medically necessary care for each ER patient.

189. HMA established a corporate benchmark for Quality Review patients of "discharge no more than 35%." This meant that HMA required emergency physicians to recommend to admit at least 65% of patients selected for admission by the Quality Review program, without regard for the medical necessity of that admission. Upon information and belief, the HMA Quality Review benchmarks were in place and enforced throughout the HMA system since 2003.

190. Pro-MED's QualCheck program increases admissions because it immediately alerts the ER physician that a patient meets HMA's very low admission criteria. The emergency physician who does not agree that admission is necessary, must then manually "override" the QualCheck program's recommendation for admission.

191. HMA established a corporate benchmark for QualCheck overrides (< 30%), meaning emergency physicians must admit at least 70% of patients selected for admission by the low standards HMA selected for the QualCheck program. HMA's mandate was enforced without regard for the physicians' determination of medical necessity of that admission.

192. Many HMA facilities met or exceeded this QualCheck benchmark by admitting

43

more than 70% of QualCheck patients. These include: Dade City; Amory, Mississippi; Jacksoncentral; Gasden, Alabama; Port Charlotte, Florida; Statesboro; Punta Gorda, Florida; Brandon; Hamlet; Anniston; Brooksville; Crystal River; and Sebastian, Florida.

    a.    **Admissions Benchmarks: Emphasis on Revenues from Medicare Patients**

193.    Three of the HMA's ED performance benchmarks are aimed at increasing admissions: % of Admissions; % of Total Patients with Quality Review Identified Who Were Discharged; % of attendings called. As discussed below, in June of 2005, HMA added additional benchmarks aimed at illegally generating revenues through Medicare ER patients.

## PERCENT OF ADMISSIONS

194.    The % of admissions measure is calculated by dividing the number of ER patients admitted to the hospital for inpatient care by the total number of new ED patients. HMA's corporate benchmark since October 2003 for "% of admission" has been 16%. HMA's minimum overall admission rate for emergency patients shows a blatant disregard for the sanctity of the doctor-patient relationship. The medical necessity of even one admission must be determined by the emergency physician after an examination of the patient, not influenced by corporate benchmarks.

195.    Federal and state laws and regulations require a determination of medical necessity for each patient – negating the validity of any "minimum" admission rate set by the hospital's corporate leaders.

196.    Although HMA's official corporate benchmark for overall ER admissions was 16%, the actual goal HMA imposed on each hospital may be higher. For example, at Lake Norman, the admission goal was 25%. This was communicated to ED Nurse Manger Tonya Kirby by Jamie Stoner in approximately February 2010.

44

197.   Many HMA facilities met or exceeded HMA's official minimum admissions benchmark. These included: Anniston, Gasden, and Hartsville.

198.   Lake Norman admits currently approximately 15% of their daily volume of 70 patients. Amazingly, meeting HMA's goal of 25% would require Lake Norman emergency physicians to admit seven (7) additional patients per day. An average admission carries a minimum charge of $5,000. Seven (7) admissions would bring additional revenues to HMA's Lake Norman of $35,000 per day, or $12 million per year. HMA's enforcement of policies to illegally admit ED patients has caused unnecessary ER admissions at nearly all HMA's 55 facilities, generating at least $600 million in illegal in-patient charges per year.

## CALLING ATTENDING PHYSICIANS TO INCREASE HOSPITAL ADMISSIONS

199.   HMA executives knew that if an emergency physician calls the patient's private attending physician, there is a higher likelihood that the patient will be admitted to the hospital. Calling an attending also has the potential to increase the ER patient's level of care, which affects the reimbursement available under government healthcare programs, even for patients who are not admitted.

200.   As stated above, on April 15, 2010, Robin Clark, Chief Nursing Officer (CNO) at Davis Regional, admitted to Dr. Steve Folstad in the midst of a daily Flash Meeting that HMA's true purpose in requiring ED physicians to call the patient's attending physician was to increase admissions to the hospital.

201.   Since October of 2003, HMA has mandated that emergency physicians call the attending physician for more than 30% of ER patients. In contrast, upon information and belief, nationally, ED physicians call the patients' attending physician in 15-20% of ER cases.

202.   MEMA often makes calls to attending physicians to arrange follow-up for patients

45

who should be rechecked in a day or two, or to consult with a specialist to discuss a particular case. However, these calls aimed at providing quality medicine are not HMA's focus. In fact, HMA does not give the emergency physician credit for calls to physicians or other specialists without admitting privileges at the HMA hospital.

203. In April 2010, HMA increased the benchmark for attendings called to greater than 35% of all patients. As described below, HMA has effectively set a special benchmark for attendings called for patients over 65 at 100%.

204. Relying on their individual medical judgment as to each unique patient's medical needs, since October of 2003, MEMA physicians at Davis Regional and Lake Norman did not meet HMA's corporate benchmarks for "% of attendings called." For example, from October 2003 until June 2005, MEMA physicians at Davis Regional called the attending physician for 15.4% to 21.2% of all ER patients.

     **b.**     <u>HMA's National Demands to Increase Medicare Admissions</u>

205. Beginning in June of 2005, from time to time, Relator Mason would receive monthly Pro-MED Executive Summary Reports. He continued to receive these reports until MEMA received its notice of termination on May 3, 2010. The Pro-MED Executive Summary Report for June 2005 included a separate report to track lucrative Medicare-eligible patients who entered its hospital ERs: the "Patients 65 and Older Report."

206. This "Patients 65 and Older Report" details the following data for patients 65 and older: patients total number, admissions total number, % admitted; attending called total number; % attending called.

207. HMA established ED performance benchmarks for each Medicare standard: % patients admitted (> 50%); % attending called (> 75%).

208. HMA employed these illegal ER admissions benchmarks and through corporate executives, division leaders, and hospital administrators brought considerable pressure upon emergency physicians to meet them.

209. In addition to pressure exerted on Relator, other emergency physicians and staff were pressured to meet HMA's minimum admission rate. For example, in a September 2009 discussion with Relator Mason, Salvador E. Arceo, MD, an EmCare physician at HMA's River Oaks Hospital in Jackson, Mississippi, admitted to Relator Mason that he is pressured by EmCare and HMA superiors to admit QualCheck patients. Dr. Arceo stated that he admits them because it is easier to admit them then justify why they were not admitted. In addition, during a cocktail party in Chicago in February 2010, Joey Vice, RN, the manager of the HMA ED in Anniston, Alabama told Relator Mason that hospital administrators bring great pressure on ED managers to ensure that doctors in the ED order tests and admit patients.

210. HMA's official corporate benchmarks include a minimum admission rate of 50% of Medicare patients (65 and older). This exceeds the national average Medicare admission rate of 45% for Medicare beneficiaries.

211. Since at least July 2005, HMA facilities have been meeting and exceeding the 50% admission rate for patients 65 and older. These include: Brandon, Clarksdale, Jackson, and Natchez, Mississippi; Dade City, Haines City, Punta Gorda, and Sebastian, Florida; Durant and Midwest City, Oklahoma; Mesquite, Texas; Tullahoma and Lebanon, Tennessee.

212. Although HMA's official benchmark for admitting patients 65 and older is 50%, HMA executives expected their ED doctors to admit a much higher percentage. For example, when Relator Mason attended the August 12, 2009 HMA Division 1 Meeting in Charlotte, North Carolina, Britt Reynolds, HMA's Division 1 President (who is not a physician and has no clinical

47

training), incredulously proclaimed to the emergency physicians present: "If you are not admitting 75% of your Medicare patients, you are not practicing quality medicine." HMA's minimum admission rate of 75% of Medicare patients grossly exceeds the 45% national average.

213. HMA would challenge ED physicians during daily Flash Meetings to justify why they did not admit all patients age 65 and older. Thus, HMA created an effective admission benchmark for Medicare patients of 100%. HMA also mandated that ED physician call the patient's private attending physician for 75% of patients 65 and over.

214. HMA's benchmark of 75% far exceeds the typical 15%-20% of cases where the ED physician needs to consult with a private attending physician to arrange for follow-up care or to discuss the discharge, transfer, or possible admission decision for patients, including those over 65. HMA's benchmark for calling attendings for patients over 65 receives particular scrutiny from HMA executives on a daily basis.

215. For example, on April 18, 2010, MEMA physician Steve Greer was challenged for not calling the attending physician (to encourage admission) for an elderly woman who fell at a nursing home. Her most serious injury was an abrasion to her knee. HMA Division 1 CEO, Britt Reynolds, as well as Division 1 Vice President, Angela Marchi, challenged Dr. Greer's independent medical judgment.

216. Some HMA facilities surpassed HMA's official benchmark (75%) for calling attendings for patients over 65. For example, in June 2005, the ED physicians at HMA's hospital in Mesquite, Texas, turned in a stellar performance (98%) for calling attending physicians for Medicare-eligible patients. Presumably, the admissions of patients increased.

217. During Relator's tenure at HMA, HMA executives expected that ED physicians would call the attending for a much higher % of patients over 65 then the official benchmark of

75%. This expectation continues to the present, as recently as December 14, 2010, the current ED Director at Lake Norman communicated to the ED physicians that the goal for PCP/Specialist/Hospitalist consults for patients >65 was 100%.

218. Relying on their medical judgment as to each unique patient's medical needs, since October 2003, MEMA physicians at Davis Regional often did not meet HMA's corporate benchmarks for % of admissions.

219. For example, between October of 2003 and June of 2005, MEMA physicians at Davis recommended admission for 11% to 15% of all new patients visiting the ER. In addition, MEMA physicians have historically admitted 45% of their Medicare patients, in keeping with the national average admission rate. This was far below HMA's goal of 75%.

c. **Benchmarks for Quality Review and QualCheck of Discharged Patients**

220. Since at least October 2003, HMA has employed a "Quality Review" program, part of the Pro-MED Patient Manager software which flags patient charts for admission based on data entered in the ED nurses' Pro-MED EMR. This occurs while the patient is still in the ER.

221. The "% of Total Patients with Quality Review Identified Who Were Discharged" measures the % of patients for whom the ED physician, arguably, did not follow HMA's "Quality Review" recommendation for admission. Since 2003, HMA's corporate benchmark for % Quality Review patients discharged has been < 35%.

222. Although the Quality Review reports were not discussed with MEMA physicians on a daily basis until some time in 2009, Relator understood that HMA has pressured emergency physicians in other HMA facilities since 2003 to meet this benchmark.

223. Relying on their individual medical judgment as to each unique patient's medical needs, since October 2003, MEMA physicians staffing Davis Regional's ED did not meet HMA's

49

corporate benchmarks for "% of Total Patients with Quality Review Identified Who Were Discharged." From October 2003 until June 2005, MEMA physicians at Davis Regional discharged between 49.2% and 64.1% of all patients identified as meeting admission standards by the HMA/Pro-MED "Quality Review." Beginning in 2006, HMA's use of Pro-MED's QualCheck enabled HMA to flag patients for admission based on the physician's EMR.

224.　Although Pro-MED claims that its Case Management software, including the QualCheck program, facilitates admission decisions and prompts involvement of case managers, like Quality Review, the real purpose of QualCheck was to increase admissions.

225.　In fact, HMA did not even have case managers for all of their EDs. For example, there was no case manager in the ED at Lake Norman. Rather, the CFO at Lake Norman, Jamie Stoner, instructed the ED Nurse Manager, Tonya Kirby, that she (Tonya) or her assistant must stay in the evening "to make sure the ED doctors are admitting the patients they are supposed to."

226.　After 2006, when HMA implemented the QualCheck enhancement to the Pro-MED software, HMA imposed a corporate benchmark which required that emergency physicians override fewer than 30% of patients selected by QualCheck for admission.

### 8.　The Fall of 2008: HMA Increases Pressures on Hospital ED Physicians to Meet Corporate Benchmarks Aimed at Unnecessary Admissions and Tests

227.　A Pro-MED report, the Time Study Patient Flow Evaluation of July 2008, introduced the Pro-MED "Dashboard Report" to HMA's emergency physicians. HMA used these reports and related Flash Meetings to police and enforce corporate ED benchmarks aimed at driving up volumes for ER tests and in-patient admissions.

228.　During the summer of 2008, HMA announced that CEO Burke Whitman would be

Case 3:12-cv-00817-GCM　Document 4　Filed 01/09/13　Page 58 of 139

replaced in September of 2008 by a new leader, Gary Newsome. Upon information and belief, the July 2008 Pro-MED HMA Time Study Patient Flow Evaluation report introduced HMA's new plan for greater corporate control of HMA's ERs.

229.    Beginning in August 2008, HMA's divisional and corporate management reviewed the ED metrics for testing and admissions with greater frequency and intensity. HMA scrutinized ED physicians' testing and admission decisions through Pro-MED products, which allowed both real time and retrospective daily and weekly reviews of the previous day's ED data to pressure emergency physicians and ER staff to meet HMA benchmarks to optimize revenue.

   a.    **HMA Uses Pro-MED's Daily, Weekly, and Monthly Reports to Implement Its Illegal Program to Generate Revenues through Excessive Tests and Unwarranted Admissions**

230.    Since August 2008, HMA has used daily Pro-MED Dashboard Reports to review the emergency physicians' prior day performances against HMA's corporate benchmarks, including CTM guidelines tests and minimum admission rates. Dashboard Reports have been reviewed with ED staff during daily Flash Meetings.

231.    The daily Pro-MED Dashboard Report for each of the 55 HMA facilities tracks approximately 23 data items, which include: new patient visits (Admissions #; Admissions %); QR disch % (quality review discharged); qual check criteria met not admit %; testing guidelines %; attd call %; patients 65 and older visits #; patients 65 and older adm %; patients 65 and older trans %; patients 65 and older PCP consult %.

232.    In August 2008, HMA executives increased their efforts to police corporate ED benchmarks by instituting the Daily ED Flash Meeting. At this meeting, held in the ER each morning at the end of the night shift, HMA hospital executives reviewed the previous day's ER activity contained in the Pro-MED daily Dashboard Report. HMA required ED physicians to justify

51

why corporate ED benchmarks were not met.

233. For example, each morning all patients over 65 (even those with minor trauma), all patients who meet Quality Review criteria, and all QualCheck patients who are not admitted are reviewed. The emergency physician in attendance must justify each patient not admitted. Thus, although the official HMA benchmarks for admitting patients 65 and older and for admitting Quality Review and QualCheck patients was less than 100%, HMA used the Pro-MED reports and ED Flash Meetings to impose an effective benchmark of 100% for admissions of patients over 65.

234. In fact, emergency physicians at other HMA facilities throughout the country admitted to Relator Mason that they simply admit the vast majority of QualCheck and Quality Review patients, rather than deal with HMA executives' scrutiny and harassment. These include Kevin Sells, MD from Stringfellow Memorial in Anniston, Alabama and Salvador E. Arceo, MD, from River Oaks Hospital in Jackson, Mississippi. Dr. Sells and Dr. Arceo both told Relator Mason that they just admit QualCheck patients when prompted by the Pro-MED system.

235. Although ED Flash Meetings are held by the HMA hospital administration and attended by the ED Nurse Manager and the emergency physician, a hospital executive (i.e., the CFO, Comptroller, or the Hospital CEO) also usually attended.

236. During the September 2009 ED Core meeting in Naples, Florida, CEO Newsome required that hospital CEOs attend the daily ED Flash Meeting. Newsome added that he would make unannounced appearances at hospitals to ensure that the hospital CEO attended. Newsome did attend numerous ED Flash meetings at HMA hospitals, including some of those held at Lake Norman.

237. At HMA hospitals, a hospital administrator creates an ER Round Report which includes the results of each ED Flash Meeting for several days or a week. The ER Round Report is

then provided to HMA corporate executives, the local hospital administration, and the ED Directors.

238.    The ER Round Reports contain "Pro-MED Indicator(s)," including: admit rate, attending called %, 65+ admit rate, 65+ attending called %, QualCheck met not admitted, testing guidelines." The ER Round Report provides the benchmark data from the previous day, highlights benchmarks not met, and includes notes on discussions from the ED Flash Meetings. The ER Round Report form bears the following bolded note: "If results less than benchmark, then action notation is needed."

### b.    Newsome Leaves Defendant CHS and Returns to HMA Bringing Intensified Support for Focus on ER Revenues

239.    When Newsome returned to HMA from CHS in September of 2008 and took over as CEO, HMA restructured its executive management team so that all of HMA's hospital operations began to report directly to Newsome. Gary Newsome has ardently supported Pro-MED, as evidenced by policies he instituted at HMA hospitals and comments he made during Earnings Calls.

240.    For example, on February 24, 2009, during an Earnings Call for HMA's Q4 2008 (Newsome's first quarter at HMA), CEO Newsome was asked about CHS's "ability to grow earnings a little bit better than most of their peers in the industry." Newsome responded that CHS had benefitted from having "been steeped in the Pro-MED ER process so they understand that process and continue to perform well." Newsome also stated that CHS benefitted from a "discipline[d] approach to the business." Newsome added that he was deploying these same measures at HMA.

241.    Newsome demonstrated his support for Pro-MED software in the HMA "Earnings Call Transcript" from April 28, 2009. In discussing HMA earnings from the first quarter for 2009, Newsome described the Pro-MED enhancements made since the Fourth Quarter in 2008

53

(Newsome's first three months on the job): "We have completed the hardware and software upgrades for our clinical guideline driven ER patient system called Pro-MED. As you know this tool is designed by ER professionals that we used to improve patient flow, quality and the delivery of care in the ER." In the same call, Newsome credited HMA's "focus on ER Operations" as a contributing factor to HMA "volume improvements" for the last quarter of 2008 and the first quarter of 2009.

### 9. Revised (2008) Complaint Test Mapping Guidelines

242. On or about October 23, 2008, HMA released the revised Pro-MED CTM guidelines. The document bears the following notation: "HMA/EmCare Master Complaint Test Mapping," as well as the Pro-MED trademark. The 2008 CTM guidelines (pretest order sets) consisted of a table listing 516 chief complaints and the tests ordered when each was selected.

243. HMA's CMO, Ronald N. Riner, MD, refers to the 2008 revised CTM guidelines as "Pro-MED ED Complaint Test Mapping (Pretest Order Sets)." These tests, according to HMA's CMO, Ronald N. Riner, MD, were developed "in an attempt to shorten" long wait times for patients in the ER.

244. For each chief complaint, the HMA CTM guidelines table lists the tests triggered when the complaint is selected by the triage nurse, whether the guidelines test is mandatory ("true") or to be considered by the physician ("false"), the charge code, and the department to perform the test (lab or radiology). As was the case for the original CTM guidelines, the emergency physician could add to the 2008 CTM guidelines locally by changing a "false" test to a mandatory "true," but they could not delete any of the "true" tests or change a true (mandatory) test to false (discretionary).

245. After HMA, EmCare, and Pro-MED created the 2008 Pro-MED CTM guidelines,

54

HMA installed the program in each of its hospitals across the country. HMA maintained corporate benchmarks which required that emergency physicians order 80% of the 2008 Pro-MED CTM guidelines. Relator became immediately alarmed when they reviewed the 2008 Pro-MED CTM guidelines. He quickly concluded that HMA's new standard CTM guidelines would cause emergency physicians to order fraudulent and medically unnecessary ER tests.

246. For example, for the 75-year old patient who presented to HMA's ER after October 23, 2008 with a chief complaint of "confusion - new onset," the 2008 CTM guidelines would order: Bedside Glucose, CBC, CMP, CPK MB, Total CPK, Urine Drug Screen, ETOH, PT, PTT, Troponin I, Urinalysis, EKG, and Portable Chest x-ray. Of these, the following six tests would be unnecessary: CPK MB, Total CPK, PT, PTT, and Troponin I.

247. By way of further example, for the patient who presented to HMA's ER after October 23, 2008 with a chief complaint of "vaginal bleeding (pregnant less than 20 weeks)" HMA would immediately order the following tests: Quantitative B-HBG; CBC; Type and Screen; and a Complete OB Ultrasound. As discussed above, a urinalysis, should be performed initially to differentiate vaginal bleeding from blood in the urine. This is listed only as optional in the 2008 CTM guidelines. Medicaid patients seen in HMA's ERs would rarely need a Type and Screen. At best, only an Rh typing is needed. An OB Ultrasound costs hundreds of dollars, and, as with other tests, should never be ordered prior to the physician seeing the patient.

248. Thus, HMA's October 2008 CTM guidelines (imposed after Newsome arrived as CEO) caused excessive mandatory tests to be performed for thousands of patients who were treated in HMA's 55 ERs. The revised 2008 CTM guidelines were patently excessive from a fraud and abuse perspective.

249. The patient charts which MEMA received from HMA, when they included the Pro-

55

MED Orders Summary, illustrate the types and volume of excessive tests generated through HMA's October 2008 CTM Guidelines, which were issued in early November 2008.

250.    Dr. Mason immediately raised his concerns about the 2008 CTM guidelines to HMA's CEO at Lake Norman, Michael Cowling.  Mr. Cowling responded that emergency physicians at Lake Norman and Davis Regional were expected to meet HMA's corporate benchmark of 80% for the 2008 CTM guidelines.

251.    Relator has observed first hand numerous cases where the Pro-MED CTM program automatically ordered tests that were medically unnecessary.

### 10.    HMA Executives Harass Emergency Room Physicians to Drive Tests and Admissions

252.    As discussed above, shortly before Newsome's arrival in September 2008 at HMA, executives intensified efforts to pressure ED physicians to meet testing and admission benchmarks. For example, HMA Division executives harassed ED physicians through daily and weekly reports and meetings which highlighted physicians who did not admit patients.

253.    As also discussed above, in late October of 2008, HMA issued and implemented new and more excessive CTM guidelines.  At the same time, HMA denied the local ED Medical Directors the ability to edit the CTM guidelines and insisted that EDs implement HMA's standard 2008 CTM guidelines "as is."

254.    Just days after HMA issued its 2008 CTM guidelines, on October 29, 2008, Dr. Folstad (as the MEMA President) was called to a meeting with the Division 1 President, Vickie Briggs, and Division 1 CFO, Chris Hilton. This was Dr. Folstad's first meeting with Ms. Briggs. It occurred shortly after Newsome took over as CEO, and it was a direct result of Newsome's efforts to use corporate pressure to maximize ER charges and admissions.

56

255. During that meeting, Chris Hilton advised Dr. Folstad that MEMA was not taking good care of HMA's ER patients because its emergency physicians were not ordering enough tests, and not admitting enough patients. Vickie Briggs added that MEMA had a long reputation of being resistant to HMA's "patient initiatives." She asked Dr. Folstad if MEMA was going to "get on board with HMA's new ER incentives." Briggs added that "if MEMA was not going to cooperate, HMA would be finding an ER group that would." Dr. Folstad asked for, but did not receive, any evidence which supported HMA's contentions that these tests actually helped patients.

256. On November 5, 2008, Relator Mason received a copy of a November 4, 2008 memo written by Ronald Riner, MD, HMA's contracted CMO, regarding the new (2008) Pro-MED CTM guidelines. Dr. Riner first acknowledged the "numerous questions and calls we [HMA] have received concerning the Complaint Test Mapping (Pretest Order Sets) that are being implemented in the Pro-MED software program."

257. Dr. Riner also acknowledged in his memo that "many" of the ED physicians and/or ED Directors throughout the HMA chain "have voiced concerns about the Pro-MED software program." HMA's CMO stated that HMA has "reviewed this and discussed this in great detail," but decided to remain with Pro-MED and focus on staff and ED physician training.

258. When Relator Mason and other emergency physicians in the HMA system raised concerns with the revised 2008 CTM guidelines, HMA responded through its Chief Medical Officer, that ED physicians at HMA EDs nationwide were expected to use the CTM guidelines. HMA also demanded that EDs meet or exceed HMA's corporate benchmark of 80% for guidelines testing. Unfortunately, both the CTM guidelines and the benchmark bore no relationship to the patients' true medical conditions or to evidence-based medicine.

259. From October 2008, when HMA prohibited ED Directors from editing the CTM

57

guidelines, Relator Mason avoided unnecessary tests mandated by the Pro-MED CTM software by training ER triage nurses at Lake Norman to select benign chief complaints which would trigger minimal diagnostic tests in the Pro-MED program.

260.    MEMA physicians at Davis Regional also attempted to circumvent HMA's fraudulent practices after October 2008 by compiling a list of chief complaints that initiated little or no testing and posting it at the triage desk for nurses to select from. However, once the Davis Regional hospital administration learned of the list, the ER nurses were prohibited from using it.

11.    **HMA Required ED Directors to Review and the Medical Executive Committees (MECs) to Approve the 2008 Pro-MED Complaint Test Mapping Guidelines in Attempt to Shift Responsibility for Fraudulent Tests to Emergency Patients**

261.    In the last paragraph of the November 2, 2008 memo, Riner, through HMA, attempted to cloak the CTM guidelines in legitimacy and shift the responsibility for ordering the outrageously unnecessary tests through CTM guidelines on to the ED Director and the emergency physicians: "**PLEASE NOTE** that the protocols being utilized will need to be vetted and approved by the appropriate medical staff organizational structure (either MEC or ED Department at each of your respective hospitals)."

262.    Dr. Riner's memo reveals HMA's attempt, through the alleged MEC approval process, to attempt to create the illusion that the ED physicians were exercising their independent judgment to choose the appropriate and necessary diagnostic tests for their patients when they reviewed the 2008 CTM guidelines. In reality, HMA made clear that the standard 2008 CTM guidelines must be approved and that the ED directors could not deviate from them.

263.    HMA pressured ED Directors to assist in having the hospital MEC approve the 2008 Pro-MED CTM guidelines. For example, HMA's CEO at Lake Norman made it clear to

58

Relator Mason that the 2008 CTM guidelines must be used or MEMA would be terminated. Under extreme pressure from HMA, Relator Mason presented the 2008 CTM guidelines to the MEC at Lake Norman for approval. This was done with the understanding that HMA would continue to review them and Relator's complaints.

264.    At Davis Regional, HMA also threatened the MEMA physicians with contract termination unless they presented the 2008 CTM guidelines to the MEC. Dr. Greer, the MEMA ED Director for Davis at the time, recommended the 2008 CTM guidelines to the Davis Regional MEC for approval only because it was made clear to him by HMA administration that recommending disapproval would cost MEMA the Davis Regional ED contract.

265.    Through the memo by HMA's CMO (Dr. Riner), it is clear that HMA knows that the emergency physician alone is supposed to determine the medical necessity of diagnostic studies for ED patients: "Again, the physician bears the ultimate responsibility and accountability for the laboratory tests that are ordered on any patient. Cognizant of this fact we all need to work closely and expeditiously with our ED physicians to finalize protocols that will help manage patients efficiently and effectively." In stark reality, HMA pressured the ED physicians to rubber stamp the 2008 Pro-MED CTM guidelines.

266.    Dr. Riner then stated that he "reminds" the ED Directors and physicians that the HMA 2008 Compliance Work Plan "requires that at least annually, we ensure that the Pro-MED Test Mapping protocols have been reviewed by the Emergency Department physicians and formally approved by the hospital's Medical Executive Committee. Copies of all changes to the test mapping protocols must be saved and available for audit." Riner said this when he knew full well that nurses had been ordering tests and that Medical Executive Committees had not been approving this. In fact, Relator first learned of this unknown HMA policy at the time of Dr. Riner's November 2008

59

memo.

267. In December 2008, MEMA's outside health care attorney, Alice G. Gosfield, Esquire, a nationally recognized health care attorney, in a non-privileged communication, wrote to HMA's Chief Medical officer and raised her clients' concerns about potential fraud and abuse related to HMA's CTM guidelines.

268. Relator Mason was first asked to review the 2008 CTM guidelines with the Lake Norman MEC in January 2009. Dr. Folstad was never asked to review the CTM guidelines or to have it approved by the Medical Executive Committee ("MEC") while he was the Medical Director at Davis Regional (2000-2007).

### 12. Relator's Attempt to Work with HMA to Reduce the Complaint Test Mapping Guidelines to More Acceptable Levels

269. Throughout the fall of 2008, and into 2009, Relator Mason repeatedly contacted HMA and offered his assistance in working with HMA and EmCare to reduce the 2008 CTM guidelines to acceptable medical levels. Relator Mason had conversations and/or communications with HMA executives, including, but not limited to, the hospital CEO at Lake Norman (Cowling), the CEO at Davis Regional (Metz), HMA's CMO, Dr. Riner and HMA's Corporate Director of Emergency Medicine, Lynne West.

270. In response to Relator Mason's criticism of the 2008 CTM guidelines, in the fall of 2008, Karen Metz, CEO of Davis Regional, contacted Relator Mason and invited him to participate in a meeting of other "concerned" emergency physicians to revise the 2008 CTM guidelines.

271. On January 8, 2009, HMA's contracted CMO, Dr. Riner, sent a memo to Relator Mason inviting him to the Naples meeting.

272. On January 23, 2009, Relator Mason discussed the revised CTM with HMA's

60

quality review consultant, Lisa Nummi, RN/CNP (Certified Nurse Practitioner). After Dr. Mason discussed MEMA's concerns with Pro-MED, Nummi agreed that the CTM generated fraudulent and unnecessary tests "for revenue generation."

273.    Thereafter, on January 26, 2009, in a follow-up email to Relator Mason, Ms. Nummi stated that she was supposed to attend the February 3, 2009 CTM Task Force meeting, but was reassigned to another hospital and will be joining the meeting by conference call. Nummi assured Dr. Mason that she had relayed Dr. Mason's actual views to Dr. Riner. Ms. Nummi made it clear to Dr. Mason that she intended to be MEMA's ally at the "Quality meeting" in Naples on February 3, 2009.

### a.    HMA's National CTM Task Force Meets at Its Naples, Florida Headquarters

274.    On February 3, 2009, the so-called CTM Task Force met at HMA's Naples, Florida corporate headquarters to review and "recommend revisions" to the fall 2008 version of the Pro-MED CTM guidelines. Under the direction of EmCare's Dr. Wheelis, the attendees discussed changes to the 2008 CTM guidelines intended to pare down the tests automatically ordered by HMA's triage nurses.

275.    In addition to EmCare's Dr. Wheelis, the CTM national Task Force meeting attendees included HMA executives, HMA hospital emergency physicians and EmCare executives, including:

- Terry Meadows, MD, EmCare executive;

- George Loukatos, MD, EmCare physician at Central Mississippi Medical Center;

- Scot D. Fell, DO, an emergency medicine physician who practices at Venice Regional Medical Center, Venice, Florida (participated by conference call);

61

- Edwin D Moore, DO, a family practitioner who provides ER care through TeamHealth at HMA's Seven Rivers Regional Medical Center, Chrystal River, Florida;

- Relator Tommy Mason;

- Chris Pinderski, MD, an emergency physician at HMA's Poplar Bluff Regional Medical Center – North, and outspoken opponent of the 2008 CTM guidelines;

- Lisa Nummi (participated by conference call);

- Lynne West, HMA's Corporate Director of Emergency Medicine (participated by conference call).

276. When Relator Mason and the other attendees first sat down, they received a packet of documents. The packet of documents provided to Relator Mason included, but was not limited to: HMA's standard October 2008 Pro-MED CTM guidelines, as well as a copy of Pro-MED CTM guidelines that bore the name of a hospital in CHS's system.

277. Relator Mason is not aware if any of the other attendees also received a copy of CTM Guidelines with the name of a CHS facility emboldened on them.

278. The CTM guidelines report for the CHS facility was the same format as the Pro-MED CTM report that Relator Mason had received for HMA's CTM Guidelines. Relator Mason recalls that the CTM guidelines for the CHS facility were also substantively the same as HMA's excessive October 2008 CTM guidelines. The only difference was that, at the top of the page, in the place of HMA or a HMA facility, the CTM guidelines bore the name of a CHS hospital.

279. At the February 3, 2009 meeting, Relator Mason and the other attendees were told "this is the same CTM used by Mr. Newsome at CHS and the physicians there had no problems with it." Thus, Relator Mason understood that HMA's excessive October 2008 CTM guidelines were the same CTM Guidelines used system-wide at CHS hospital EDs. Relator Mason also

62

understood that when Gary Newsome took over as HMA's CEO, he brought to HMA the Pro-MED CTM guidelines that he had used at CHS.

280.    Although Relator Mason expected that the national Task Force would engage in a critical discussion of the revised CTM, he and Dr. Pinderski were the only outspoken critics of the 2008 CTM guidelines.

281.    EmCare physicians who attended the Task Force meeting resisted removing tests from the revised CTM guideline.  Instead, they preferred to create additional general chief complaints that would generate few or no tests.  For example, the Task Force added a complaint called "abdominal pain, general" that would not have guidelines tests associated with it.

282.    Upon information and belief, the reason to add benign complaints, rather than reduce the tests ordered for existing chief complaints, was to leave intact the excessive 2008 CTM guidelines so that HMA could still force the triage nurses at the majority of HMA facilities to use them.

283.    EmCare physicians, including Drs. Wheelis and Meadows, did not advocate reducing the CTM guidelines, but were passive participants during the discussions.

284.    Ultimately, the national Task Force issued "recommendations" that HMA revise the 2008 Pro-MED CTM guidelines.  While the CTM Task Force both reduced the number of tests for the chief complaints listed and added chief complaints for conditions that would order only a few tests, the recommended revisions fell short of the changes requested by Drs. Mason and Pinderski.

285.    For example, the Task Force removed the most egregious outrageous test sets (i.e., complete blood count for all children with a fever), but added a complaint for "abdominal pain-benign."

286.    After the Task Force meeting (February 4, 2009), HMA responded to the Task

63

Force's "recommendations" to revise the CTM guidelines through a memo written by CMO, Ron Riner, MD. HMA stated that its next "course of action" for the 2008 CTM guidelines (as revised in 2009), would include HMA management review and distribution to Pro-MED, followed by the HMA hospital ED Directors' review and approval by the Medical Executive Committee (MEC) within 30 days. Although HMA "anticipated a meeting of the Complaint Test Mapping Task Force to review progress and needed adjustments," HMA never sought such a meeting.

287. On February 5, 2009, the Riner Group provided HMA executives and the attendees of the Task Force meeting with revised CTM guidelines. The document attached to the Riner Group's email was titled "CTM updated 2 3 09 true tests only."

288. Upon information and belief, HMA retained another version of the CTM guidelines which included both "true" and "false" guidelines tests. By doing so, HMA allowed its emergency departments to continue to use many of the tests contained in the excessive 2008 CTM guidelines.

289. The 2008 CTM guidelines were in place at all 55 HMA facilities from October 2008 until at least March 19, 2009. Relator believes that during this time, hundreds of thousands of unnecessary tests were ordered for patients in HMA's emergency rooms.

290. Although Relator was advised that HMA would install the revised (2009) CTM guidelines in all HMA facilities after the February 2009 meeting, Relator has no knowledge of whether this has occurred.

291. In fact, Relator believes that HMA did not re-issue to Relator a complete or master set of CTM Guidelines after Relator challenged the HMA/EmCare Master CTM dated October 23, 2008. Further, Relator believes that HMA did not make all of the changes Relator Mason and others requested at the Naples Meeting on February 3, 2009. In fact, rather than paring down the unnecessary tests ordered using CTM, HMA actually ADDED new true tests to some chief

64

complaints after the so-called Task Force meeting in 2009, i.e., a blood culture for a cough with fever.

### b. Complaint Test Mapping Abuses Continues After the Florida Task Force Meeting

292. While the February 2009 Naples meeting may have resulted in the removal of some of the most egregious tests to be ordered by HMA's nurses, the revised (2009) CTM guidelines employed by HMA continue to cause the submission of many false claims for hundreds of unnecessary tests.

293. In particular, Complaint Test Mapping abuses continued even after the February 2009 revisions, including, but not limited to, the tests ordered for the following chief complaints:

- All patients over 55 with abdominal pain receive unnecessary EKGs, which should never be ordered without the benefit of the treating physician's determination;

- All patients with a sore throat receive a complete blood count ("CBC");

- Patients who are pregnant less than 20 weeks and have vaginal bleeding, receive a complete blood count ("CBC" ) and Type & Screen (which are unnecessary), as well as the Quantitative B-HCG, which should be selected by the physician after the patient assessment;

- Patients who are unresponsive or unconscious receive unnecessary CK, CK-MP; PT, PTT, Troponin, and ABG tests;

- Patients who are in cardiac arrest (and whom would be seen by the physician immediately) have a battery of tests ordered by the triage nurse before the physician sees the patient, including: complete blood count ("CBC"), complete metabolic panel ("CMP"), CPK-MB, CPK Total, Magnesium, PT, PTT, Troponin, ABG, EKG, and Chest x-ray.

294. After the February 3, 2009 meeting until at least August 2010, HMA continued to

65

maintain and mandate Complaint Test Mapping (CTM) that is standardized in Pro-MED for all HMA facilities. These standard HMA CTM tests sets include "true" tests that HMA expects the nurses to order at the time of triage, before the patient is seen by a physician. These mandates continue to the present.

295. When the emergency physician cancels any of these unnecessary tests, HMA subjects them to great pressure for not meeting the corporate testing guidelines benchmark.

296. Since 2003, Relator has received various versions of Pro-MED CTM Guidelines from HMA. While the CTM Guidelines imposed by HMA differ in some respects, particularly after October 2008, reviewing these detailed lists of tests ordered for every patient with a particular chief complaint has provided Relator with direct knowledge of HMA's scheme to cause the excessive ER tests to be ordered nationwide at HMA facilities. These emergency room testing abuses by HMA result in the submission of false claims to state and federal healthcare programs.

### 13. HMA's Drive in 2009 and 2010 to Force Emergency Physicians to Adhere to HMA's Corporate Benchmarks for Admissions

297. In 2009, HMA executives continued to harass ED physicians to drive admissions. HMA added action plans and comments in weekly Pro-MED ER Round Reports. When HMA guidelines were not met, action plans were immediately implemented and communicated to HMA corporate officers. There were daily pressures to admit every ER patient 65 and older, even those with the most benign conditions.

298. On January 27, 2009, there was a meeting at Davis Regional between Lake Norman and Davis Regional administrators (Lake Norman CEO, Cowling, and Davis Regional CEO, Metz), the ED Medical Directors (Relator Mason and Dr. Greer), and Dr. Folstad to discuss the emergency physicians' concerns and the pressure the HMA hospital CEOs were under to use the Pro-MED

66

system.

299.  From January to June 2009, MEMA physicians had resisted using the Pro-MED physician EMR, an inferior and slow product, with the hope that HMA would permit the continued use of a paper T-System physician record. These efforts failed and, on June 1, 2009, the Pro-MED physician EMR (which would allow HMA to run QualCheck) was installed at Lake Norman and Davis Regional.

300.  Pro-MED stated in the July 2008 Time Studies and Patient Flow Report that the Pro-MED programs, including the physician EMR, would facilitate a _shorter_ length of stay for the ER patient. In fact, after the slow Pro-MED physician EMR was installed at Lake Norman, the time for the ER patient to see the physician has _increased_ by 40%. At Lake Norman, ED Flash Meetings began in June of 2009, when Greg Lowe took over as hospital CEO. With these Flash Meetings, HMA increased its pressure to meet corporate benchmarks for admissions and testing.

301.  For example, on August 17, 2009, Lynne West, HMA Corporate Director of Emergency, wrote an email to ED nurse managers and ED Directors regarding the Dashboard Reports: "Big declines in > 65 admissions – you know what to do! Start reviewing > 65 by MD report and meeting with your medical director to formulate a new game plan."

302.  On December 14, 2009, Angela Marchi wrote an e-mail questioning Dr. Folstad about the low performance on several ED benchmarks at Lake Norman. The specific benchmarks that she focused on included: a low admit rate; a high QualCheck override rate; and a low attendings called rate for the ED population in general, and in patients over age 65 in particular. She demanded to know Dr. Folstad's plan to "reverse these metrics immediately."

303.  In addition, HMA hospital executives implemented an action plan at Davis Regional in early 2010 to increase overall attending called statistics: call the attending for 100% of patients

67

over 65, even when HMA knew that admission was not necessary. An April 7, 2010 notation by Davis Regional's CNO, Robin Clark, on the ER Round Report provides: "We continue to struggle with attending called for all patients. It was discussed and agreed to months ago that attendings would be contacted for all 65+ patients. This was done as a courtesy even if patients do not require admission to assist in continuity of care." (Emphasis added). In contrast, HMA's physicians, including Dr. Gish, Lake Norman's Chief of Staff, have made it clear to Relator that they trust ER physicians to call them only when necessary.

304.    HMA admits that the purpose of HMA's benchmark for attendings called was not a legitimate concern for continuity of patient care, but solely to increase hospital admissions. On April 15, 2010, the Chief Nursing Officer at Davis, Robin Clark, RN, conducted the ED Flash Meeting with Dr. Folstad. Dr. Folstad asked Clark for the true purpose of calling the patient's private attending physician.

305.    Clark stated that HMA's sole purpose in imposing the "attendings called" benchmark was not intended as a check on the quality of the MEMA ED physicians' care, nor to provide better communication with the medical staff about their patients. Clark admitted that HMA wanted the patient's attendings called to try to persuade the attending physicians to admit more patients into HMA hospitals.

306.    In April 2010, Angela Marchi, VP Operations, Division 1, began to send daily emails to MEMA ED Directors questioning the HMA benchmarks in the ER Round Reports. For example, on April 6, 2010, Marchi wrote to Relator Mason "re: volumes and admissions at Lake Norman not being 'metric':" Marchi's questions included: "Were LWOTs called back? Why testing guidelines low? Why not meet benchmark in calling attending with volume that high?"

307.    In a later email to MEMA's Dr. Greer, dated April 8, 2010, Marchi (referencing the

68

100% benchmark for calling attendings for patients over 65), asked: "Dr. Greer, why are > 65's not being called? This is simply not acceptable."

308. HMA's policies and practices to pressure ED physicians and to interfere with the emergency physicians' treatment decisions resulted in thousands of unnecessary in-patient hospital admissions.

**14. HMA Established Revenue-Generating Corporate ED Benchmarks for Testing and Admissions without Support that they Promote the Quality of Patient Care**

309. Relator has repeatedly requested that HMA provide him with some evidence-based medical support for the ED benchmarks as they relate to quality emergency care, but HMA has never provided any scientific support for its ED benchmarks.

310. The Pro-MED CTM guidelines and HMA's related testing benchmarks, as implemented, do not benefit either the patient or the ED staff. The Pro-MED CTM guidelines generate medically unnecessary tests. In turn, the patient is subjected to unnecessary pain, discomfort, and inconvenience attendant to unneeded diagnostic studies. The ED staff is preoccupied with unnecessary tests that actually contribute to delays in the ER.

311. Upon information and belief, HMA's other admissions' benchmarks are arbitrary and were not implemented based on established standards of medical care. HMA mandates that patients be admitted without regard to medical necessity actually undermines patient care because these patients are unnecessarily exposed to health risks (i.e., infection and other known complications related to a hospital admission).

312. HMA has required since 2003 that physicians in its EDs call patients' attending physicians at least 30% of the time (75% for Medicare patients) and that ED physicians admit at least 16% of new ED patients (and 75% of Medicare patients). However, as recently as

69

September 2009, HMA lacked any evidence-based support for these benchmarks.

313. HMA established an "ED Core" group in early 2009 after emergency physicians raised concerns with the 2008 CTM guidelines. Before he was fired, Relator Mason participated in the HMA Core Group through two conference calls and two meetings, one in September 2009 and another in February 2010.

314. Relator Mason's efforts to effectuate corporate change on testing and admission levels included his work on the ED Core group at HMA. During the September 22, 2009 meeting, Relator Mason repeated earlier requests for evidence-based support for HMA's ED benchmarks for patient admission and attending called.

315. The minutes from HMA's ED Core Meeting on September 22, 2009 included the following agenda items or action points for the next meeting: "[u]ndertake a search of the literature for background information and evidence-based information concerning admission rates and call to referring physician rates."

316. HMA executives in attendance who agreed in late 2009 to <u>look for</u> evidence-based support for ED performance benchmarks (which HMA had put in place at least <u>6 years</u> earlier) included Ronald Riner, MD, HMA's CMO and Stanley D. McLemore, HMA's Senior Vice President – Operations.

317. HMA implemented the Pro-MED's CTM guidelines at all HMA hospital EDs. Pro-MED has blatantly touted the revenue-generating benefit of "consistent utilization" of the testing guidelines. Using HMA's Paintsville hospital as an example, Pro-MED has highlighted and also quantified for HMA the revenues that are gained or lost depending on the EDs adherence to HMA benchmarks for Pro-MED's CTM guidelines.

318. Using Paintsville's $300,000 per month, HMA earns approximately $3.6 million

70

annually at each of HMA hospital EDs as a result of HMA mandates for unnecessary minimum tests ordered through CTM alone. Across the HMA network of 55 hospitals, this translates to $198 million annually from unnecessary tests. Only HMA benefits from the unnecessary charges related to CTM guidelines.

319. Other HMA benchmarks also serve to generate significant revenues for HMA, while placing significant demands on ED physicians' time and detracting from patient care. For example, HMA's mandate that ED physicians call attendings in order to increase admissions means that ED physicians spend precious time on the phone unnecessarily, time that could be spent with patients or documenting their charts.

320. Upon information and belief, HMA's mandates for minimum admission rates result in hundreds of millions of dollars in illegal charges each year. This is in addition to illegal charges related to unnecessary tests.

321. For example, from June 1, 2009 to May 3, 2010 MEMA physicians at Davis Regional initiated QualCheck overrides for 286 patients which HMA Pro-MED software selected for admission, 91 were Medicare, and 48 were Medicaid patients. From May 9, 2009 to May 9, 2010, there were 463 patients at Lake Norman for whom MEMA physicians initiated QualCheck overrides, of which 208 were Medicare and 39 were Medicaid. Had MEMA met HMA's minimum admission rates, based on a conservative minimum charge of $5,000 per admission, Davis Regional and Lake Norman would have caused close to $2 million in damages to the Medicare program alone.

### 15. MEMA Meets Other HMA Benchmarks Not Focused Solely on Maximizing Revenues

322. Pro-MED reports prepared for HMA also include other data related to the time it

71

takes to process the patient through the ED because: "excessive wait times and lengths of stay in the Emergency Department create frustration for patients and families and often have a negative impact on customer satisfaction and perception of quality of care."

323.    HMA's corporate benchmarks from 2003 also include measures reflecting the time it takes to process the patient through the ER ("throughput time"), and other information that can impact on patient satisfaction and quality of care, for example: average length of stay (ALOS), and patients who left without treatment (LWOT) or against medical advice (AMA).

324.    Relator understands that some HMA benchmarks, including AMA/LWOT and ALOS can impact on the quality of patient care. For example, an ED patient who waits too long may become so frustrated that they leave without treatment (LWOT) or against medical advice (AMA).

325.    Since 2003, the HMA benchmark for ALOS is < 2.0 hours. The national average is about 4.5 hours. The HMA benchmark for LWOT/AMA is < 2.0%. The national average is about 4%.

326.    Although HMA touts its testing and admissions benchmark as "quality" indicators, the HMA facilities with the highest performance on these standards often had the highest ALOS. For example, the following facilities as of January 2010 met HMA testing mandates, but were poor performances on true quality indicators: Punta Gorda, number 15 on test guidelines, but number 31 on ALOS (2:29); Natchez, number 1 on test guidelines, number 42 on ALOS (2:51), and ranks 51 or 52 in AMA/LWOT at 3.3%; Sebastian, number 2 on test guidelines, but ranks 29 (2:27) on ALOS; Lebanon, ranks number 4 in test guidelines, but number 32 on ALOS (2:30); Gadsden meets HMA's benchmark for testing guidelines (85.8%), but has an ALOS of 3:27 (making it 53/53 for ALOS, and number 35 for AMA/LWOT at 2.1%.

72

327.    While the hospital ERs staffed by MEMA physicians may not meet HMA's testing and admissions benchmarks, the Lake Norman and Davis ERs have performed well in AMA/LWOT and ALOS. For example, as of January 2010, both facilities were well below HMA's benchmark for AMA/LWOT of < 2%. In addition, the ALOS for both facilities was much shorter than many HMA facilities meeting or exceeding HMA's benchmarks for guidelines tests, (i.e., Natchez and Gadsden) and well below the national average of 4.5 hours.

### 16.    HMA's Efforts to Use Pro-MED's Nurse and Physician Documentation to Increase Facilities Charges

328.    When a patient is documented as having a higher acuity, a hospital can bill for higher level of care. For Medicare patients, charges related to Emergency Room APCs (and/or inpatient DRGs) on the facility side are based on the level of care.

329.    Pro-MED generates a level of care for each ER patient. The patient record that MEMA receives to conduct its own billing often included the Orders Summary, which includes the level of care ascribed by Pro-MED for the patient's emergency room care at HMA's facilities. Other aspects of patient care, including tests and procedures also increase the facilities' charges for ER care.

330.    HMA placed great pressure on ER nurses to document patient acuity. Patient charts were reviewed each day by an ED nurse for completeness of nurse documentation.

331.    During the time that Newsome was at HMA, the nurse that reviewed nurse documentation was usually Joyce McLean, RN. If there were deficiencies on the nursing documentation, Nurse McLean contacted the nurse to make changes as soon as possible.

332.    Relator understands that the acuity for the facility side of ER charges is based in part on the emergency department nurses' documentation. Relator understood that nurse staffing was

73

also based upon these acuity records. Interestingly, HMA had, during the Relator's tenure, cut nursing staff (and continues to cut nursing staff) in both Lake Norman and Davis Regional ERs. This is incongruous with HMA's 2008 and 2009 10-Ks which credit increased acuity with higher hospital revenues.

### a. HMA Boasts Increased Acuity Led to Increased Revenues

333. Upon information and belief, both extended teaching and critical care are elements that impact on patient acuity, and therefore, the level of care billed by HMA to payors for its facilities charges.

334. In its SEC filings for FYE 12/31/2008, HMA stated that net revenues had increased since third quarter 2008 due, in part, to "increased patient acuity." (Newsome arrived at HMA in Q3 2008). Again, for FYE 12/31/2009, HMA stated that "Net revenue per adjusted admission at our same 2008 hospitals increased approximately 2.4% during the 2009 Calendar Year as compared to the 2008 Calendar Year." HMA cited "increased patient acuity" as a contributing factor.

### b. HMA's Benchmark for Nursing Acuity

335. Several Pro-MED reports prepared for HMA track "Nursing Acuity Weighted Mean:" HMA Pro-MED Executive Summary; the Forced Rank Report, with a corporate benchmark of 3.43; the ER Round Reports document nursing acuity as a data element reported each morning and discussed in ED Flash Meetings.

336. The Pro-MED program automatically generates the "patient acuity based on level of service provided and documented." As stated above, the Pro-MED Orders Summary (which lists the Pro-MED CTM tests, the time ordered, any procedures or treatments ordered by the emergency physician), also typically included an ED Level of Care ascribed by Pro-MED. Based on Relator's review of the records provided for beneficiaries of Medicare, Medicaid, and other government

74

health programs, ED level of care ascribed by Pro-MED to most of these patients treated at Lake Norman and Davis Regional was at least three.

337. In June of 2009, Lynne West, Director of Emergency Services, created a list of "Pro-MED opportunities for improvement." An item which West ascribed the "Highest Level of Priority" was a request to change Pro-MED's 5-point system that drives the acuity level, a system that is different from the ACEP-accredited acuity criteria: "E&M levels; In Blue, Pro-MED attaches acuity points that drives the level. This is an issue... If the nurse over documents the patient will receive an inappropriate higher level."

### c. Over-Documenting Acuity Through Nurses' So-Called "Extended Teaching"

338. The Pro-MED Electronic Nursing Documentation (END) "includes prompts to assure thorough documentation for all areas of assessment and of APC procedures, optimizing billing opportunities." For most patients at Davis Regional and Lake Norman, the Discharge section of the Pro-MED Nurse Documentation report mentions "extended teaching" by the emergency nurses.

339. Relator believes that the documentation of "extended teaching" may be a shortcut or macro entered into the Pro-MED program, possibly related to a Pro-MED prompt, because the term "extended teaching" is misspelled "extending" teaching in the Pro-MED Nurse Documentation report for every Davis Regional and Lake Norman patient record where it appears.

340. Many Lake Norman patient charts have a table of "points" for various tasks included in the Nurse Documentation. Upon information and belief, the points chart is used by Pro-MED to determine the patient acuity, which is automatically generated by the Pro-MED program. In the Nurse Documentation reports for both Lake Norman and Davis Regional patients, the "extended

75

teaching" usually consists of providing routine discharge instructions, which should not add to the patient acuity.

341. Extended teaching, when included in the chart, is always associated with 10 points. Other tasks are assigned far fewer points by Pro-MED for nursing care than extended teaching: neurological or cardiovascular assessment (each 3 points); NG tube insertion (5 points).

342. Upon information and belief, the documentation of "extended teaching" for the majority of HMA patients is another means devised by HMA to fraudulently increase the facilities side charges for ER care.

      **d.**    **Pro-MED Prompts Physicians to Document for "Critical Care"**

343. In the Physician EMR, the Pro-MED software has a prompt for acuity level (critical care) which is similar to the QualCheck prompt, a box that appears instructing the physician to admit the patient. Once the emergency physician selects admission as the disposition, for patients meeting HMA's corporate criteria, a second box then appears instructing the emergency physician to document Critical Care. Many of the cases where HMA's Pro-MED system recommends Critical Care documentation are as exaggerated and egregious as the recommendations for admissions.

344. Like the admission prompt, this critical care prompt was an invitation by HMA to physicians willing to conspire in the effort to overbill for medical care. Relator believes that EmCare and other emergency physicians would likely have provided HMA with unfounded physician documentation for critical care.

    **17.**    **Pro-MED Actively Advanced HMA's Efforts to Generate Revenue from Unnecessary Tests and Admissions**

345. Since 2003, Pro-MED has implemented at HMA facilities the programs necessary

76

for HMA to gather data on ED tests and admissions, to organize that data, and to facilitate HMA's tight corporate control over medical decisions made by ED physicians.

346. Pro-MED implemented ED software at HMA facilities, including the nurse's EMR and the physician's EMR, as well as the Pro-MED CTM guidelines. All of these programs enable HMA executives to collect ER patient data, to generate unnecessary diagnostic tests using Complaint Test Mapping, and to police ED physicians' decisions to recommend admission to HMA facilities.

347. In 2006, Pro-MED recommended to HMA a program called "QualCheck," which HMA used to interject minimal corporate admission standards in an attempt to exert greater influence over the ED physicians' medical judgment and to increase unnecessary admissions.

348. In a June 8, 2007 Pro-MED Performance Review Letter, analyzing the ED at Davis Regional, Pro-MED recognized that the Pro-MED CTM guidelines are a means to exert corporate control over emergency physicians' decisions to order tests when it recommended that HMA "review and revise testing guidelines to ensure they meet corporation . . . expectations." In 2008, Pro-MED was instrumental in developing HMA's revised and more outrageous CTM guidelines.

349. On July 28, 2008 Pro-MED issued a Time Studies and Patient Flow Assessment Report. This study, prepared by Pro-MED's COO, Len Strickland, RN and Paul Lindeman, MD, resulted from a recent "meeting with corporate management," and was allegedly conducted after low results on patient/family satisfaction surveys in many HMA ERs which were attributed, in part, to excessive wait times and length of stays."

350. The Pro-MED authors of the Time Study report of July 2008 specifically refer to Complaint Test Mapping as a means to maximize revenue per patient. Using HMA's Paintsville, Kentucky facility as an example, Pro-MED actually quantified for HMA's corporate management

77

the substantial revenues generated by adherence to the Pro-MED CTM guidelines.

351. In this same July 2008 Time Study Patient Flow report, Pro-MED also made the following recommendations for implementing HMA's corporate benchmarks: triage nurses should order the Pro-MED Complaint Test Mapping guidelines tests immediately after triage; HMA's emergency room triage nurses should order guidelines tests 70% of the time within 10 minutes of triage. (The existing HMA benchmark was 67%); HMA should "review and modify practice (testing) guidelines so that number of tests in HMA hospitals is consistent with the standards);" HMA should "maintain established benchmark (greater than 80% for using practice guidelines overall) to ensure a consistent high quality of care and optimize revenue potential for ancillary services."

352. Following the recommendations of the Pro-MED report of July 2008, HMA both issued revised Complaint Test Mapping (practice guidelines) and demanded that all HMA hospital EDs implement them.

## VIII. FRAUD ALLEGATIONS BY RELATOR MASON AGAINST DEFENDANT CHS:

**CHS Employs Pro-MED Systems to Bill Federal and State Healthcare Programs for Unnecessary Emergency Room Services (Diagnostic Studies) and In-Patient Admissions of ER Patients**

353. In early 2011, in an effort to secure work to replace the terminated Lake Norman contract, Relator Mason attended three meetings at Defendant CHS's Spring Memorial Hospital. The information provided to Dr. Mason at these meetings confirmed information that Dr. Mason received in February 2009: CHS uses the Pro-MED ED systems and software, including CTM Guidelines. Through Relator Mason's encounters with former CHS corporate and hospital executives, Relator Mason has learned firsthand that CHS employs Pro-MED ED software and systems, and related corporate ED benchmarks, in order to cause the submission of claims for

Case 3:12-cv-00817-GCM   Document 4   Filed 01/09/13   Page 86 of 139

unnecessary ER and in-patient services. Relator Mason also knows that CHS offers kickbacks to ER physicians to induce them to meet CHS's corporate ED metrics which result in ordering unnecessary tests and admitting patients unnecessarily.

### A. Relator Mason Knows Former CHS Executives from Their Tenure at HMA: Newsome, Reynolds, and Lowe Left CHS Division II to Join HMA

### 1. Former CHS Division II Executives: Gary Newsome and Britt Reynolds

354. Relator Mason first became aware of Gary Newsome in the summer of 2008, when HMA announced that Newsome, then an executive at CHS, would become HMA's next Chief Executive Officer. At that time, Relator Mason was the ED Director at HMA's Lake Norman Regional Medical Center.

355. From 1998 until September of 2008, Newsome worked at CHS as President, Division II Operations. In that position, Newsome was the executive in charge of hospital operations for CHS facilities in Illinois, New Jersey, Pennsylvania, Tennessee and West Virginia. Before becoming a Division II President, Newsome had served as Vice President of Group Operations at CHS. Ten years earlier, in 1998, Newsome left HMA to join the executive team at CHS.

356. Other former CHS executives followed Newsome to HMA in late 2008. For example, Britt Reynolds joined Newsome at HMA in December of 2008 as Division I President. Reynolds is currently based in HMA's corporate headquarters in Naples, Florida, and he reports directly to CEO Newsome. While at CHS from 2002 until 2008, Reynolds served as Vice President of Operations, managing hospitals in Illinois, New Jersey, Pennsylvania and West Virginia, and he worked directly under Newsome.

79

357. Since leaving CHS, Reynolds has led HMA's Division I, including both North Carolina facilities formerly staffed by MEMA physicians: Lake Norman Regional Medical Center (where Relator Mason served as ED Medical Director) and Davis Regional Medical Center (where Dr. Folstad had served as ED Medical Director). Relator Mason first came to know former CHS executive Reynolds when he took over as HMA's Division I President.

### 2. Former CHS Division II Hospital Executive, Greg Lowe

358. Before becoming CEO at HMA's Lake Norman on June 1, 2009, Greg Lowe served as the CEO at Dyersburg Regional Medical Center in Dyersburg, Tennessee. Before Dyersburg, Lowe had spent two years in Easton, Pennsylvania as the assistant CEO at Easton Hospital. Both Dyersburg and Easton were hospitals owned and operated by Defendant CHS. In addition, Pennsylvania and Tennessee hospitals where Lowe worked are part of CHS's Division II. Thus, Newsome, Reynolds, and Lowe had all worked together before they left CHS to join HMA.

### 3. Relator Mason Learns in February 2009 that HMA's New CEO (CHS's Former Division Executive) Brought the Excessive 2008 Pro-MED CTM Guidelines to HMA from CHS

359. As recited above, on February 3, 2009, Relator Mason, as part of HMA's so-called "CTM Task Force," met at the company's Naples, Florida corporate headquarters to review and "recommend revisions" to HMA's October 2008 Pro-MED CTM guidelines. The CTM "Task Force" meeting attendees included HMA executives and HMA hospital emergency physicians.

### 4. HMA Offers Kickbacks (Lucrative Contracts and Cash) to Induce ER Physicians, to Refer or Recommend Patients for Unnecessary In-Patient and Out-Patient Treatment (Diagnostic Tests and Admissions)

360. HMA provides kickbacks to emergency medicine practices who were complying

with their benchmarks for unnecessary tests and unnecessary admissions by renewing or awarding them lucrative emergency room professional services contracts. HMA discharges ER physicians who do not meet HMA's performance standards for unnecessary tests and admissions.

361. For example, from at least 2008 until mid-2010, HMA repeatedly threatened MEMA with contract termination for failure to participate in its fraud. Particularly, HMA communicated orally through Division executives and hospital CEOs that if MEMA did not meet HMA's testing and admission benchmarks, HMA would fire MEMA and replace it with a physician group that would.

362. On October 27, 2009, during a meeting at CEO Greg Lowe's office at Lake Norman, Angela Marchi told Dr. Folstad that Pro-MED software and testing guidelines were "here to stay," that HMA was not going to change these procedures, and that MEMA must "work with us or you are gone." Marchi added that Dr. Folstad needed "to get Dr. Mason under control." At the time Relator Mason was the most vocal critic of HMA's illegal testing and admissions' practices. Relator understood this to mean that if MEMA did not follow the Pro-MED CTM guidelines, implement the Pro-MED physician EMR needed to run QualCheck, and meet HMA's other ED benchmarks, he would be terminated.

## HMA ATTEMPTS TO INDUCE MEMA WITH
## CASH TO MEET CORPORATE BENCHMARKS

363. MEMA resisted HMA's efforts to employ fraudulent emergency room practices at Lake Norman and Davis Regional. HMA offered MEMA physicians at both facilities cash "awards" to meet its corporate benchmarks. MEMA refused HMA's offers of illegal cash inducements as illegal kickbacks to meet testing and admissions benchmarks.

364. On approximately July 16, 2006, Karen Metz, the then Davis CEO, offered cash

81

incentives to meet HMA's testing and admissions ED benchmarks to Dr. Folstad. At the time, he was the ED Medical Director at Davis. In a proposed amendment to the MEMA contract, HMA offered "bonuses" or "awards" of $3,000 per quarter to each emergency physician who met CTM guidelines and attendings called benchmarks.

365. Dr. Folstad refused to participate in HMA's incentives aimed at increasing ER tests ordered or patients admitted though the ER because he knew these offers to be illegal. When Dr. Folstad told Karen Metz that MEMA could participate only in the incentives related to quality patient care (LOS and physician exam times), Metz rejected Dr. Folstad's suggestion.

366. Greg Lowe became HMA's CEO at Lake Norman in early June, 2009. Shortly thereafter, he offered similar incentives to MEMA. Particularly, on or about June 22, 2009, Lowe sent an email to Relator Mason which stated: "I've attached a proposal similar to one I had in place at my last hospital related to some of the **quality indicators** tracked by Pro-MED. We should discuss what our goals would be set at given historical performance. Let me know your availability."

367. Lowe attached a document to his June 22, 2009 email, which detailed proposed cash payments for participation in HMA's fraud. In practice, HMA offered each MEMA physician $2,000 per quarter for each of six HMA corporate benchmark met, including the following three benchmarks related to patient admissions and tests ordered:

- Physician test guideline adherence: > 80% (complaint test mapping);

- Attending called: > 30%;

- Quality review criteria met: fewer than 35% cases not admitted when picked up by Pro-MED as eligible for admission;

Given the number of MEMA staff members at Lake Norman, these kickbacks offered by CEO

Lowe could total $250,000 per year.

368.    Like Dr. Folstad, Relator Mason refused HMA's offer of incentives related to ER tests and/or admission. Relator Mason also told Lowe that MEMA physicians did not need bribes to strive for excellence in the metrics related to quality patient care. Mason told Lowe that he considered the offer a bribe and that it was "fraud and abuse." In response to Mason's statement, Lowe became very angry, insulted Dr. Mason, denied that they were kickbacks, and said," Everyone does this kinda thing." Lowe added that he had "done it before."

### 5.    Greg Lowe Tells Relator Mason: CHS Offers ED Physicians Incentives to Meet Pro-MED "Quality Indicators"

369.    On June 22, 2009, shortly after Lake Norman CEO, Greg Lowe, arrived at HMA, he sent an email to Relator Mason offering "incentives" to cooperate with HMA's testing and admissions benchmarks. Lowe wrote: "I've attached a proposal similar to one I had in place at my last hospital related to some of the quality indicators tracked by Pro-MED."

370.    Just prior to joining HMA, Lowe's "last hospital" was CHS's Dyersburg Regional, a facility in Tennessee facility, where Lowe was CEO until May 19, 2009. Dyersburg Regional is part of HMA CEO Newsome's former CHS Division, Division II.

371.    Mr. Lowe made it clear in the email he sent to Dr. Mason, in which he attached the written incentive offer, that CHS both uses Pro-MED to track ED performance metrics, and provides emergency physicians with monetary incentives to meet them.

372.    Lowe's proposed incentives that he brought from CHS were to be "monitored on the Hospital's Pro-MED system," and included the following standards and monetary inducements:

| Monitor | Standard | Eligible Quarterly Pay-Out |
|---------|----------|---------------------------|
| AMA/LWOT rate | <2% | $2,000 |
| Physician Test Guidelines Adherence | >80% | $2,000 |
| Attending Physician | >30% | $2,000 |
| Called Physician Exam Time | <27 minutes | $2,000 |
| ER Pt. ALOS | <2 hours | $2,000 |
| Quality Review Criteria Met | <35% | $2,000 |

373.    Dr. Criner, the former ED Director at Dyersburg during Mr. Lowe's tenure, has boasted that he (the ED Director) increased admissions there from 13% to 20% during Lowe's tenure.

6.    **MEMA and Relator Mason Notify HMA CEO Newsome that HMA's ER Practices Involve Fraud and Abuse**

374.    Thereafter, on August 18, 2009, Relator Mason wrote an email to HMA CEO Newsome and reported that HMA's 2008 CTM guidelines require that ER physicians order an egregiously excessive volume of tests and amounted to fraud and abuse, that would put all involved "at risk under any regulatory review."

375.    Relator Mason also explained that the Pro-MED physician EMR program causes excessive delays in moving patients through the ER, which negatively impacts patient care. Relator Mason enclosed letters from his partners, who echoed Dr. Mason's concerns, as well as their own concerns that the implementation of HMA's benchmarks interfere with the ED physicians' independent judgment regarding the best care for the patient.

376.    On August 25, 2009, Relator Mason, Dr. Folstad, and Dr. Greer, MEMA Medical Director at Davis, met with Greg Lowe, CEO at Lake Norman, HMA Division 1 President, Britt Reynolds, and Division 1 Vice President Angie Marchi. When the attendees took their seats, the first words Britt Reynolds uttered were: "If this meeting is anything about Medicare compliance

84

and fraud and abuse, this meeting is over, and we will need to bring our attorneys." It is clear that MEMA expressed grave concerns that HMA's program would create fraudulent claims.

377. At the same time, Reynolds also told MEMA that HMA was going to correct the problems with the Pro-MED Physician EMR and provide the emergency physicians with a patient medical record that works. Reynolds stated that Angie Marchi and Relator Mason would be sent to Florida to work on revising the Pro-MED Physician EMR. Two months later, MEMA was told that they must implement the Pro-MED Physician EMR "as is" or be terminated.

378. In January 2010, Relator Mason refused to recommend that the Lake Norman MEC approve the 2009 Pro-MED CTM guidelines. He was silent, rather than vote against approval, in order to avoid inciting the wrath of Lake Norman CEO, Greg Lowe. Lowe was angry that MEMA did not "fall in line" and approve HMA's Pro-MED CTM guidelines.

379. In the winter and spring of 2010, Relator Mason repeatedly reported to HMA's CEO at Lake Norman that the HMA reviews of ER data were attempts to have ER physicians order tests and admit patients unnecessarily. In response, Lowe frequently threatened to cancel MEMA's contract and get a group that would comply with HMA's ER agenda.

380. On May 3, 2010, HMA's hospital executives at Lake Norman provided notice, both orally and in writing, to MEMA's President, Dr. Folstad, that HMA was terminating the Lake Norman contract with MEMA effective November 3, 2010. HMA later revised this notice to reflect a termination date of October 29, 2010.

381. On that same date, HMA's hospital executives at Davis provided similar notice to MEMA's President, Dr. Folstad, that it was terminating the Davis Regional contract with MEMA effective August 31, 2010. HMA terminated MEMA's contracts "without cause" and as a direct result of Relator Mason's and MEMA's doctors' refusal to participate in HMA's blatant

85

fraud.

382. HMA's May 3, 2010 notice of termination to MEMA stated that it was terminating the Lake Norman and Davis Regional professional services contracts without cause based on "philosophical differences." In fact, HMA lacked cause to terminate MEMA because the services MEMA contracted to provide - emergency medicine and creating a record of that care - were of the highest quality.

383. By May 3, 2010, HMA had already contracted with EmCare to replace MEMA ED physicians at Lake Norman, and HMA had already contacted another group to take over the ED at Davis Regional.

**B.    Relator Mason's Efforts to Find Moonlighting Work Led Him to CHS and Back to the Familiar Pro-MED Systems and Software**

**1.    Relator Mason's Contact with the ED Director at CHS's Springs Memorial**

384. After HMA improperly terminated MEMA's contract at Lake Norman effective November 3, 2010, Relator Mason contacted a number of hospitals near Mooresville, North Carolina, in order to pick up work as a moonlighter. To this end, Relator Mason contacted Team Health, the company with the ED contract at CHS's Lancaster, South Carolina facility, Springs Memorial Hospital (hereafter "CHS's Springs Memorial," or "Springs Memorial").

385. Otis Speight, MD, the ED Medical Director at Springs Memorial, responded to Relator Mason's inquiry, and left a voicemail expressing interest. Relator Mason did not return Dr. Speight's call immediately because he had arranged to provide emergency medical services at another hospital in Mt. Airy, North Carolina.

386. Soon after he began working at the Mt. Airy ED, Relator Mason learned that this group would be switching from paper charting to an electronic medical record in the spring of

2011. The Medical Director at Mt. Airy informed Dr. Mason that the new system was very difficult to use and their group was unhappy about the change, but they were being forced to use it by the hospital. Instead of having to learn a third EMR in two years, Dr. Mason decided to take a closer look at the job at Springs Memorial.

387.    On December 11, 2010, Relator Mason was working in the ED at Presbyterian Hospital Huntersville. That evening, Dr. Speight came into the Huntersville ER. Dr. Mason introduced himself in recognition of Dr. Speight's earlier response to Dr. Mason's inquiry about work at Springs Memorial.

388.    During their December 11, 2010 conversation, Relator Mason inquired about CHS's Lancaster, South Carolina facility (Springs Memorial). Dr. Speight responded that the ER nurses had been using the Pro-MED electronic record and Complaint Test Mapping (CTM) for some time. Dr. Speight told Relator Mason that CHS currently tracks ED "metrics" and has regular meetings with ER physicians regarding these metrics.

389.    Dr. Speight also informed Relator Mason that CHS had mandated that all CHS hospital EDs convert to Pro-MED Physician EMR. The plan at Springs Memorial was to begin using the Pro-MED physician EMR on February 1, 2011.

390.    Relator Mason responded to Dr. Speight that he was not happy moonlighting in Mt Airy because they are switching to another physician electronic medical record (EMR). Relator Mason expressed interest in working moonlighting shifts at Springs Memorial. Dr. Speight responded that he needed help and was very interested in Relator Mason coming to Springs Memorial. Dr. Mason replied that he would look into credentialing and obtaining a South Carolina medical license. Springs Memorial Hospital is included in CHS's Division I.

391.    In addition to the division-level president, Community Health Systems

Professional Services Corporation Management Team also includes Division I Operations Leadership: Shan Carpenter, Vice President - Finance, Division I Operations; Woodford H. Fields, Vice President - Division I Operations; Todd Hill, Vice President - Practice Management, Division I Operations; Eric Roach, Vice President - Finance, Division I Operations; and Paul (a/k/a P. Paul) Smith, Vice President - Division I Operations.

392. CHS's Vice President - Division I Operations, P. Paul Smith, FACHE, was the HMA hospital CEO at Lake Norman Regional Medical Center from 1996 until mid-2008. During this time, Mr. Smith and Relator Mason had regular and ongoing interactions, which continued until Mr. Smith left HMA in May of 2008 to join CHS.

393. During his tenure at HMA, Mr. Smith ran interference between HMA's corporate policies on testing and admissions and the MEMA physicians at Lake Norman, including Relator Mason.

### 2. Relator Mason's Meeting at Springs Memorial on January 27, 2011: Relator Mason Observes CHS and HMA Use the Same Pro-MED Systems and Programs

394. In early 2011, as a follow-up to his contact with Dr. Speight in late 2010, Dr. Mason visited CHS's Springs Memorial on three occasions. On January 27, 2011, Dr. Mason met with Dr. Speight at CHS's Springs Memorial.

395. Dr. Speight provided Dr. Mason with some professional background information. Dr. Speight is board-certified in Emergency Medicine. Dr. Speight told Dr. Mason that he had worked at Springs Memorial years before but lost the contract. Speight indicated that he returned to Springs Memorial a couple of years earlier as ED Medical Director when Team Health got the contract. Team Health started at Springs Memorial in early 2009.

396. Interestingly, CHS's Springs Memorial Hospital had been led by Angela "Angie"

88

Marchi, FACHE, from August 2006 until November 2007. Ms. Marchi left CHS to become a division executive with HMA. Ms. Marchi was well-known to Relator Mason as she had proved to be a very demanding proponent of Pro-MED's systems and adherent to HMA's ED metrics.

397.    At the January 27, 2011 meeting, after providing his background information, Dr. Speight led Relator Mason to the ED work area where Dr. Speight finished a chart. There, Relator. Mason observed all of the Pro-MED screens.

398.    The CHS facility appeared to be using the same Pro-MED programs and ED systems that Relator Mason used at HMA's Lake Norman. These programs and systems were immediately familiar to Relator Mason. This was confirmed to Relator Mason by Dr. Morter, a Pro-MED consultant, at a later meeting at Springs Memorial.

399.    Dr. Speight also discussed with Relator Mason a recent trip to Florida, where Speight and other Team Health ED medical directors gathered for training on the Pro-MED physician electronic medical record ("EMR").

400.    According to Dr. Speight, the Team Health ED medical directors also attended a presentation by Quint Studer, the CEO and founder of Studer Group, which is located in Gulf Breezes, Florida. Mr. Studer is a nationally recognized management executive who purports to be an expert in ED excellence. Studer Group manages Team Health's patient satisfaction survey. Dr. Speight informed Dr. Mason that the Florida trip was focused on getting their "metrics up" and learning to use Pro-MED to accomplish this. In February of 2011, Defendant EmCare announced a partnership with the Studer Group.

## THE PRO-MED "SUPER USER" AT CHS'S SPRINGS MEMORIAL

401.    After Dr. Speight finished his chart work, he led Dr. Mason on a walking tour of Springs Memorial Hospital on the way to administration to get Dr. Mason's credentials package.

402. Dr. Speight stopped by the ED nursing office, where Dr. Mason met the Springs Memorial ED nurse directors, one male and one female. One of the ED nurse directors was new. Dr. Speight introduced the male nurse, whom he described as their new Pro-MED "super user." Dr. Speight indicated to Dr. Mason that this ER nurse was an assistant nurse manager who was brought in to assist with Pro-MED.

403. The other ED Nurse Director, Manager Tammy Cooper, RN, had also joined Springs Memorial only a short time before the January 2011 meeting. When Nurse Cooper met with Relator Mason on February 21, 2011, she told him that she had held that position at Springs Memorial only since September 2010.

404. On January 27, 2011, Relator Mason observed that CHS had implemented all of the Pro-MED systems at Springs Memorial that Relator was familiar with from his tenure as the ED Medical Director at HMA's Lake Norman. However, like Lake Norman, Springs Memorial had not initially implemented the Pro-MED physician EMR.

405. Dr. Speight told Relator Mason on January 27, 2011 that the Pro-MED physician EMR was due to be implemented at Springs Memorial in February 2011. This was confirmed by a report dated January 27, 2011 which Dr. Speight provided to Relator Mason, bearing the following at the bottom: "physician on line documentation education was completed yest. [sic] Go live set for 2/7/11."

406. At the January 27, 2011 meeting, Relator Mason told both ED nurse directors at Springs Memorial that he had used the Pro-MED physician EMR for a year and a half. Dr. Speight then repeated that they were looking forward to getting the Pro-MED physician EMR installed in the ED so that they could "improve their metrics."

90

### 3.    CHS Emergency Department Metrics: "Admit, Admit, Admit"

407.    From the ED nursing office, Dr. Speight led Relator Mason to administration, where they met with hospital CEO Doug Arbour.  When Dr. Speight introduced Relator Mason, he told Mr. Arbour that Relator Mason was an experienced Pro-MED user. Mr. Arbour immediately responded, "Admit, Admit, Admit!" Dr. Speight replied to Mr. Arbour: "Hey, our admit rate is running 20%!" CEO Arbour replied, "Yeah, I know you guys are doing good right now."

408.    During their January 27, 2011 meeting, Dr. Speight provided Relator Mason with a copy of a report titled: Springs Memorial Hospital, ER Performance Indicators January 2011. The report indicated that it included performance through January 26, 2011.

409.    According to the Springs Memorial ER Performance Indicators Report, CHS monitors ER performance on a number of metrics, including, but not limited to:

| ED Metric | Relator Mason's Understanding of the Definition |
|---|---|
| Total Volume | Number of patients entering the ER |
| Admit | Patients admitted through the ER |
| Admit % | Percentage of all ER patients admitted |
| Non SP Admit % | Percentage of non-self pay patients admitted |
| MD Called | Number of patients with primary or consulting physician called |
| MD Called % | Percentage of patients with primary or consulting physician called |
| Transfers | Number of patients transferred to other facilities |
| Transfers % | Percentage of patients transferred |
| >65 | Metrics that apply to Medicare Patients |
| >65 MD Consult | Number of Medicare patients with primary or consulting physician called |
| >65 MD Consult % | Percentage of Medicare patients with primary or consulting physician called |
| >65 Admit | Medicare patients admitted through the ER |
| >65 Admit % | Percentage of Medicare patients admitted through the ER |
| >65 Transfer | Number of Medicare patients transferred to other facilities |
| >65 Transfer % | Percentage of Medicare patients transferred to other facilities |

91

410.　CHS's Springs Memorial Hospital, ER Performance Indicators report showed 11 specific benchmarks for ED performance:

| ER Performance Indicator | CHS Benchmark |
| --- | --- |
| Admit % | >16% |
| MD Called % | >30% |
| Transfers % | <1.3% |
| >65 MD Consult % | 59.1% |
| >65 Admit % | >45 % |
| >65 Transfers % | <2 % |
| Overall Avg LOS | <2:00 |
| Triage Assessment | <7 min |
| RN Assessment | <15 min |
| MD Assessment | <27 min |
| LWOT | <2% |

411.　CHS also monitors individual emergency physician performance on the following data: total patients seen; patients admitted; % of patients admitted; and LOS (length of service). CHS brings attention to certain metrics by marking them in red on the ER Performance Indicators Report.

412.　Six of CHS's ED performance benchmarks focus on increasing admissions or the number of diagnostic tests ordered: Admit %; MD called %; Transfers %; Triage assessment <7 min; >65 MD Consult % ; >65　Admit %; >65 Transfers %. CHS also mandates that ED physicians call the patient's private attending physician for 30% of all patients and for 59.1% of patients 65 and over.

413.　Typically, the emergency physician needs to consult with a private attending physician to arrange for follow-up care or to discuss the discharge, transfer, or possible admission for 15%-20% of patients, including those over 65. CHS's 59.1% benchmark for MD called >65 exceeds the typical physician consult rate of 20% by nearly 300%.

414.　CHS's ED Director, Dr. Speight, remarked to Relator Mason that the "MD

92

Called" metric was "all about getting the physician to admit the patient."

### 4. CHS ED Benchmarks: Illegally Generating Revenues through Medicare Patients (>65)

415. From his time at HMA's Lake Norman, Relator Mason was familiar with Pro-MED reports which generated data and contained benchmarks aimed at Medicare patients (>65).

416. Beginning in June of 2005 and continuing until MEMA received HMA's notice of termination on May 3, 2010, MEMA's ED Directors at HMA facilities received Pro-MED Executive Summary Reports, which included a separate report to track lucrative Medicare-eligible patients who entered its hospital ERs: the "Patients 65 and Older Report."

417. The HMA "Patients 65 and Older Report" detailed the following data for patients 65 and older: patients total number; admissions total number; % admitted; attending called total number; % attending called.

418. HMA established ED performance benchmarks for the percentage of Medicare patients admitted and the percentage of Medicare patients for whom an attending was called.

419. Relator observed that CHS implements the same ED benchmarks contained on the HMA "Patients 65 and Older Report:" % admitted and % attending called.

### CHS AGGRESSIVELY AVOIDS TRANSFERS OF PATIENTS OVER 65

420. However, CHS has an additional ED performance metric for Medicare patients that HMA did not impose on emergency physicians during Relator' tenure: >65 Transfers (<2%). This is another means that CHS uses to ensure that Medicare patients are admitted to a CHS facility, even when more appropriate care could be provided by transfer to another facility. This maximum transfer rate interferes with the physicians' ability to select the healthcare provider based on what is best for the patient.

93

421. All of these metrics for ED performance focused on patients >65 are aimed at illegally generating revenues through Medicare ER patients. CHS, like HMA, employs these illegal ER admissions benchmarks and monitors the metrics for each ER in its system.

422. Minimum admission rates, Quality Review metrics, and the maximum transfer metric interfere with the physicians' ability to select the healthcare provider based on what is best for the patient.

### 5. CHS'S Unofficial Benchmarks May Be Higher

423. Through Relator Mason's experience with Pro-MED systems and ED benchmarks at HMA, he is aware that the official metric for ED performance may be different from real, but unofficial benchmarks to which ED physicians are held.

424. On January 27, 2011, when Relator Mason asked Dr. Speight about pressure to admit patients, Dr. Speight responded that at Springs Memorial they were encouraged, though not threatened, to admit patients.

425. This was the same level of pressure Relator Mason experienced at HMA's Lake Norman while P. Paul Smith was the hospital CEO. (Mr. Smith is currently a division executive with CHS, and Springs Memorial is within his division.)

426. However, it was clear to Relator Mason from hospital CEO Arbour's comments that CHS expects emergency physicians to meet – and exceed -- CHS's ER Performance Indicators.

427. For example, the official CHS benchmarks for patients admitted through the ER is >16%. Based on the Springs Memorial January 2011 ER Performance Indicators report, the ER physicians at Springs Memorial had been meeting that standard since 2010. However, when Dr. Speight highlighted that the recent ED admit rate at Springs Memorial was 20%, the hospital

94

CEO remarked that the emergency physicians were performing well "right now."

428.     CHS's former division executive, Britt Reynolds, announced at a HMA division meeting that emergency physicians who did not admit 75% of Medicare patients were not practicing quality Medicare. At the time, the HMA benchmark was 50%. The CHS benchmark is 45%.

### 6.     CHS's Pro-MED CTM Guidelines: Unnecessary Tests

429.     On January 27, 2011, Dr. Speight made it clear to Relator Mason that the triage nurses at CHS's Springs Memorial were "on board" with ordering CTM guidelines tests.

430.     ED Nurse Manager Cooper reinforced Dr. Speight's statement that, at triage, the emergency nurses at Springs Memorial just order whatever tests the Pro-MED CTM guidelines program tells them to notwithstanding what the patient's ultimate condition is diagnosed by a doctor to be.

431.     Dr. Speight also communicated to Relator Mason the futility of trying to cancel unnecessary tests ordered through Pro-MED CTM guidelines.

432.     Dr. Speight stated that, most of the time, the tests are back before the emergency physician even sees the patient. Dr. Speight told Relator Mason that he finds it pointless to even try to cancel unnecessary tests ordered through Pro-MED CTM guidelines.

433.     Dr. Speight indicated that the CTM guidelines used at CHS's Springs Memorial included expensive CTs and Ultrasounds. Dr. Speight told Relator Mason that the nurses would order everything on the CTM guidelines, but the doctors preferred that the nurses come to them for the high tech tests. Dr. Speight added, however, that the nurses just order these (CT and U/S) "by doctor permission" when the ER was busy.

434.     Nurse Cooper indicated that the nurses call back to discuss CTs with the doctor

95

before ordering these at triage. However, Relator Mason understands from her that most of the CTs are signed off on before the doctor ever sees the patients.

435. The Pro-MED literature makes clear that once the tests are ordered by the nurses, they cannot be deleted by the physician within Pro-MED. The physician must use the hospital staff to both cancel the test and to delete the order from the hospital host computer system directly.

### a. CHS'S ER Triage Metric Ensures Unnecessary CTM Tests are Ordered and Cannot be Cancelled

436. Dr. Speight made it clear to Relator Mason on January 27, 2011 that any effort by emergency physicians to even cancel unnecessary CTM guidelines tests would be futile.

437. The Springs Memorial ER Performance Indicators Report shows that CHS imposes minimum triage assessment standards (< 7 min.). This requirement means that the triage nurse, who initiates the CTM guidelines tests, must see the patient within 7 minutes of entering the ER. At CHS, the CTM guidelines tests, ordered at triage, are initiated long before the patient is seen by the ED physician (the CHS goal for physician assessment is <27 min.).

438. According to CHS's Springs Memorial January 2011 ER Performance Indicators Report, triage assessments were completed within three minutes in 2010, and within five minutes in January 2011. During this same time, MD assessments were not initiated until 46 and 56 minutes respectively.

439. CHS's implementation of Pro-MED CTM guidelines, and corresponding triage assessment metric, interferes with the emergency physician's medical necessity determination because the tests are ordered by the triage nurse before the physician has seen the patient.

440. When the triage nurse orders diagnostic tests for ER patients, they cannot accurately

96

reflect the emergency physician's determination of medical necessity. When unnecessary, irrelevant, or excessive tests are ordered, the ED physician would ordinarily attempt to override the Pro-MED software by attempting to cancel CTM guidelines tests which, based on the physician's assessment of the patient, are not medically necessary. The Pro-MED program used by Defendant CHS does not permit the ED physician to delete tests ordered by the triage nurses.

441.    Pro-MED has blatantly touted the revenue-generating benefit of "consistent utilization" of the testing guidelines.

442.    Using HMA's Paintsville hospital as an example, as recited above, Pro-MED has highlighted and also quantified for HMA that hundreds of thousands of dollars in revenues that are gained or lost at each hospital depends on the EDs adherence to benchmarks for Pro-MED's CTM guidelines.

443.    Across the CHS network of 129 hospitals, this translates to hundreds of millions of dollars annually from unnecessary tests, and only CHS appears to benefit from the unnecessary charges related to Pro-MED CTM guidelines.

444.    During his February 21, 2011 meeting at Springs Memorial, ED Nurse Manager Cooper told Relator Mason that, for about six years, CHS has been using Pro-MED systems software and programs in its hospitals. These include the Complaint Test Mapping (CTM) software, Pro-MED ED programs, including the Pro-MED nurse EMR, and Quality Review.

   b.    **CHS'S Master Pro-MED CTM Guidelines**

445.    During the January 27, 2011 visit to Springs Memorial, Relator Mason and Dr. Speight also discussed the Pro-MED CTM guidelines used at other CHS facilities. Dr. Speight indicated that CHS has "master" or standard CTM guidelines.

446.    ED Nurse Manager, Tammy Cooper, RN also told Relator Mason that she

97

believes that the CTM guidelines are issued by CHS corporate offices.

447. Relator Mason understood from the February 3, 2009 meeting in Naples that HMA's October 2008 CTM guidelines were the same as the CHS master CTM guidelines. The abusive nature of the HMA October 2008 CTM guidelines has been discussed above.

448. Upon information and belief, Pro-MED CTM guidelines identical to the excessive October 2008 CTM guidelines have been in place at many, or nearly all, CHS hospitals since at least 2008. Relator Mason believes that over the last six years, hundreds of thousands of unnecessary tests were ordered for patients in CHS's emergency rooms nationwide.

     c.    **Springs Memorial Pro-MED CTM Guidelines**

449. On January 27, 2011, Dr. Speight and Nurse Cooper indicated to Relator Mason that changes could be made to CHS's Master CTM guidelines set, but they did not indicate to Relator Mason whether such changes were made.

450. Dr. Speight told Relator Mason that he would provide Relator Mason with a copy of the CTM guidelines used at CHS's Springs Memorial. However, it became apparent to Relator Mason on January 27, 2011 that Dr. Speight was not a proficient Pro-MED user. He did not appear to know how to print the CTM guidelines. When Relator Mason mentioned the Pro-MED Reporter, Dr. Speight responded that Pro-MED reports, including the ED Performance Indicators Report he had provided to Relator Mason, were provided to him by the ED nurse manager.

451. On February 21, 2011, Nurse Cooper provided Relator Mason with a copy of the CTM guidelines then in place at CHS's Springs Memorial. This report bore the following title: "Springs Memorial Hospital, Complaint Test Mapping." The CTM report was dated February 21, 2011, and it bore the Pro-MED Clinical Systems, LLC, copyright.

98

452.   Based on his review of the Springs Memorial CTM guidelines, Relator Mason observed that CHS uses CTM guidelines that order many unnecessary tests, and that it contains both excessive tests for some chief complaints, as well as redundant tests. For example, some trauma patients get both a portable chest x-ray, as well as a two-view chest x-ray.

453.   Some of the chief complaints on the CHS Springs Memorial CTM guidelines include the same unnecessary tests listed on HMA's October 2008 CTM. For example, the chief complaint "confusion – new onset" generates an unnecessary CBC, CMP and urine drug screen. CHS has the same issue with ordering Amylase and Lipase.

454.   The CTM for Springs Memorial also has additional unnecessary tests not listed on the HMA October 2008 CTM guidelines. For example, a patient with "confusion – new onset" will get a CT head/brain without contrast.

455.   However, upon information and belief, the CTM guidelines for Springs Memorial are not a complete set of CHS's standard Pro-MED CTM guidelines because:

• Relator Mason recalls that the CHS CTM guidelines he reviewed in Naples, Florida in February 2009 were identical to HMA's October 2008 CTM guidelines. The Springs Memorial CTM guidelines are different from the HMA October 2008 CTM guidelines;

• ED Nurse Manager Cooper indicated that the former ED nurse manager could and may have edited the CTM guidelines;

• The chief complaint numbers on the CTM guidelines are not listed in order and some chief complaint numbers are missing;

• Some common chief complaints are not listed at all. These include, but are not limited to, abdominal pain – epigastric; cardiac arrest; chest pain atraumatic >35 years; dyspnea; headache frequent w/hx.

99

### d. Pro-MED CTM Guidelines for CHS: True and False Tests

456. Like the Pro-MED CTM guidelines used at HMA, the CTM guidelines used at CHS divide the diagnostic studies into two groups. Pro-MED reports which Relator has seen at HMA, describe the first group, "true" tests, as basic tests "intended to ensure a consistent high quality work up for all patients." The "true" tests are automatically ordered through the Pro-MED program by the triage nurse who selects the chief complaint.

457. The ordering of tests by the triage nurse at CHS hospitals, prior to the emergency physician's contact with the patient and/or authorization, violates multiple state nursing licensure laws.

458. CHS and Pro-MED designate other tests as "false" tests, those which "should be considered once the physician examines the patient." According to Pro-MED reports that Relator Mason has seen at HMA, these false tests are not supposed to be automatically ordered by the triage nurse using CTM guidelines program.

459. While at HMA, Relator learned that Pro-MED's Quality Review program selects ED patients, based on very low threshold for admission, to receive closer scrutiny by ED physicians and/or ER management.

460. According to Nurse Cooper, CHS's hospitals, including Springs Memorial, have implemented Pro-MED's Quality Review program.

### 7. Mason Meets at Springs Memorial on March 8, 2011: Pro-MED Physician EMR Training

461. In December 2010, Dr. Speight initially told Relator Mason that the Pro-MED physician EMR would be installed at Springs Memorial in early February.

462. On January 27, 2011, Nurse Cooper reported to Dr. Mason that CHS's Springs

100

Memorial facility was due to install the Pro-MED physician EMR and the accompanying QualCheck enhancement in February of 2011.

463. On February 21, 2011, Relator Mason further learned from Tammy Cooper, RN, that other EDs in the CHS system already use the Pro-MED physician EMR. Nurse Cooper also informed Relator Mason that the on-site installation of the Pro-MED physician EMR had been rescheduled for March 7. Nurse Cooper added that Springs Memorial ED will use Pro-MED's QualCheck and metrics once the Pro-MED physician EMR is installed.

464. On March 8, 2011, Relator Mason again met with Tammy Cooper, RN, in the ED. At the time, the Pro-MED physician EMR had been installed. Pro-MED and CHS had a total of four on-site trainers, most of whom were expected to be at Springs Memorial all week. Relator Mason was assigned to Greg Morter, MD.

465. Dr. Folstad and Dr. Mason had met Dr. Morter a couple of years earlier, while they were in Coral Gables, Florida for Pro-MED physician EMR training. This happened before the Pro-MED physician EMR was installed at Lake Norman and Davis Regional.

466. Dr. Morter is a pediatrician who had told the Relator Mason and Dr. Folstad before that he no longer practices, but does Pro-MED installation and other consultant work for Pro-MED related to their software. Dr. Morter recognized Relator Mason and they discussed their previous encounter.

467. Dr. Morter confirmed that CHS used the same Pro-MED programs and ED systems that Relator Mason used at HMA's Lake Norman. Dr. Morter told Relator Mason that CHS's Springs Memorial was not going to use QualCheck. However, Nurse Cooper told Relator Mason on January 27, 2011 that Springs Memorial would use QualCheck after the Pro-MED physicians EMR was installed.

101

468.    Dr. Morter showed Relator Mason the ways to create shortcuts in the Pro-MED physician EMR to speed it up. Dr. Morter told Relator Mason that the Pro-MED physician EMR would soon be in all CHS hospitals, once approximately 50 EDs were converted.

**PRO-MED'S CTM GUIDELINES AT CHS: PRO-MED TRAINERS WEIGH IN**

469.    On March 8, 2011, Relator Mason and Dr. Morter also discussed the Complaint Test Mapping program as it interacts with the Pro-MED physician EMR, which is also referred to as "physician order entry." The CTM guidelines tests are organized by chief complaint, also called an "EMR template." For example, there are guidelines tests (or an EMR template) for the chief complaint for "chest pain." The guidelines tests for the chief complaint "chest pain" are highlighted in red.

470.    Dr. Morter told Relator Mason that when the tests have been ordered through the Pro-MED CTM guidelines, there is a time stamp next to the test. If there is no time stamp, the order for the test has not been sent to the lab. The order for the test can be deleted by the physician by clicking on an "X" on the line next to the order.

471.    Dr. Morter further explained that if there is a time stamp next to the test, then the test has been ordered. In that case, the nurse must manually delete the order from the hospital computer system and call the lab to cancel or stop it, if that is possible.

472.    The very short time expected for tests to be ordered by the triage nurse (the goal at CHS is < 7 min., but Springs Memorial patients were triaged within 3 minutes in 2011) and the longer time it takes for the physician to meet with the patient (the CHS goal is < 27 min., but Springs Memorial physician assessment times are in the 56-minute range in 2011), make cancelling CTM tests very difficult, if not impossible.

473.    Cancelling the test does not remove it from the Pro-MED system. At best, the test

102

order would only be deleted from the CHS hospital computer system -- if the nurses even knew how to do this.

**8.    CHS "Locks" CTM Guidelines and Edits Require Management Permission**

474.    Dr. Speight, Dr. Morter, and Nurse Cooper all confirmed that the CHS's CTM guidelines can be locally edited, subject to limitations.

475.    For example, on March 8, 2011, Nurse Cooper provided Relator Mason with the entire CTM used at Springs Memorial (she had left off pages 44 through 52 when she first provided them to Dr. Mason on February 21, 2011). Page 52 of CHS's CTM bore the following notation: "* Indicates mapped test is locked to be consistent with approved standards. Management approval is required for change." Thus, even though Relator was informed that CHS hospitals could edit the Pro-MED CTM issued by corporate, the content of the CTM was ultimately subject to CHS management approval.

**9.    CHS Uses Pro-MED Systems to Submit or Cause Unnecessary Tests and Admissions**

    **a.    CHS's Emergency Room Initiatives to Optimize Revenues Include Pro-MED Systems**

476.    CHS reports in its financial statements the significance of Emergency Room services and initiatives. CHS recognizes that "[a]pproximately 55% of our hospital admissions originate in the emergency room...we systematically take steps to increase patient flow in our emergency rooms as a means of optimizing utilization rates for our hospitals."

477.    CHS's efforts in recent years to expand services and to "capture a greater portion of the healthcare spending in [its] markets" focused, in part, on its emergency rooms.

478.    CHS also reported to Wall Street analysts during Earning Calls that increased volumes at CHS facilities in the third quarter of 2008 were based on "physician recruitment and

better management of emergency services."

479.    CHS reports that its efforts to expand services include diagnostic testing equipment and "additional and renovated emergency rooms." For example, in 2009, CHS spent $260.4 million on projects which included new emergency rooms and other projects which "improved various diagnostic and other inpatient and outpatient service capabilities."

480.    CHS also employs multiple consultants at its corporate headquarters to assist the hospitals in their development of targeted services, including emergency, critical care, and hospitalist services.

481.    A component of CHS's upgraded emergency rooms "is the implementation of specialized computer software programs designed to assist physicians in making diagnoses and determining treatments...[in order to benefit] patients and hospital personnel by assisting in proper documentation of patient records and tracking patient flow. It enables [CHS] nurses to provide more consistent patient care and provides clear instructions to patients at time of discharge to help them better understand their treatments."

482.    During quarterly Earnings Calls conducted throughout 2008 with Wall Street investment firms, CHS's CEO, Wayne Smith touted the use of the Pro-MED system as an improvement to the emergency room that is in place at virtually all CHS hospitals. Smith also discussed Pro-MED in the context of CHS's emergency room admission rates and the "couple of points spread" between CHS and its competitors.

483.    CHS describes Pro-MED as "a computer-accessed diagnostic tool that helps doctors assess a patient's condition, formulate a diagnosis and suggest a course of treatment," which CHS uses to increase utilization of services.

484.    CHS's reliance on Pro-MED systems to increase utilization of hospital services

104

across the CHS network of hospitals is central to its scheme to maximize revenue.

**b.  CHS Uses Pro-MED ED Systems and Software To Illegally Generate Hospital Revenues**

485.   During his tenure as ER Medical Director at HMA's Lake Norman, Relator Mason observed that Pro-MED provided products (ER software) and related training, as well as consulting services, to HMA and to its hospital facilities throughout the country.

486.   As detailed above, Relator Mason learned through a February 2009 meeting at HMA's corporate offices in Naples, Florida, during his interactions with former CHS executives, and through several visits to a CHS hospital in early 2011, that CHS also uses these same Pro-MED emergency department products and services (and even the same Pro-MED consultants and trainers) as HMA.

487.   Upon information and belief, the automated processes employed at CHS facilities for moving patients through the ER were designed to proactively facilitate Pro-MED software programs employed system-wide by CHS to track both patient progress and utilization of hospital services in order to increase CHS hospital revenues though unnecessary tests and hospital admissions.

488.   Relator Mason believes that CHS, like HMA, uses Pro-MED systems and software, ER performance metrics, and performance "incentives" to illegally pressure emergency physicians at CHS facilities to generate greater revenues through hundreds of millions of dollars in unnecessary hospital services, including Emergency Room services and in-patient admissions. Relator Mason's beliefs are based upon his interactions with current and former CHS executives and physicians, and the three meetings at CHS's Springs Memorial, as well as his own observations at the ED at Springs Memorial.

105

489.   In addition, Relator Mason believes that the ED at Springs Memorial appeared to function much like the Lake Norman ED when the current division executive, Paul Smith, was with HMA. As a result, Springs Memorial is not the facility where the greatest level of fraud was occurring.

490.   However, Relator Mason also observed that CHS's Pro-MED CTM Guidelines implicate the same global problems that Relator Mason observed at HMA: nurses have to select the correct chief complaint; nurses use of Pro-MED CTM guidelines to order tests causes violations of the Nurse Practice Act; and corporate management ultimately controls the makeup of the CTM guidelines test sets, which interferes with the physician's medical judgment of the best treatment of his patient, and also implicates the corporate practice of medicine laws.

491.   In addition, CHS's ER performance metrics and pressure on ED physicians and staff to meet them lead to both unnecessary tests and admissions, even at CHS's Springs Memorial. Relator Mason believes that the fraud involving unnecessary tests and admissions is more egregious at CHS's hospitals outside Division I, particularly Division II, the CHS division formerly led by Gary Newsome before Newsome left CHS for HMA.

492.   In addition, the incentives offered by CHS to emergency physicians at CHS facilities violate the federal Anti-Kickback Statute and analogous state laws.

493.   Upon information and belief, CHS's use of the Pro-MED ER systems and software, including, but not limited to Pro-MED CTM Guidelines, admissions alerts, Quality Review, and QualCheck, together with CHS ER Performance Indicators, results in the submission of claims by CHS and/or its affiliates to government health programs for unnecessary charges for emergency room, outpatient and in-patient care at CHS facilities.

494.   Relator Mason has illustrated that for approximately six years Defendant CHS has

106

engaged in conduct which violates the federal False Claims Act and the false claims Statutes of the named States.

### c. CHS has Failed to Meet Medicare Conditions of Participation

495.    CHS and its facilities failed to meet these Medicare COPs because they violated the federal Anti-Kickback Statute.

496.    In order for CHS's services to qualify for coverage under state health care programs offered in North Carolina, California, Florida, Georgia, Illinois, Indiana, Louisiana, Nevada, New Jersey, Oklahoma, Tennessee, Texas, and Virginia, or other state health programs, including Medicaid, CHS must meet all Medicaid conditions of participation (Medicaid COPs), including compliance with the federal Anti-Kickback Statute.

497.    CHS and its facilities failed to meet these Medicaid COPs because they violated the federal Anti-Kickback Statute and applicable state Anti-Kickback Statutes.

498.    CHS and its facilities employed unlawful schemes to have ED physicians refer or recommend that patients receive diagnostic testing or other services at HMA's hospital ERs, and/or receive in-patient care at HMA hospitals by paying or offering to pay "kickbacks" to ED physicians and/or physician groups. These schemes and relationships with referring physicians violate the federal Anti-Kickback Statute and state anti-kickback laws.

499.    Compliance with the federal AKS is a condition of payment under Medicare and other Federal health care programs. The federal Anti-Kickback Statute specifically provides that a violation also constitutes a violation of the federal False Claims Act.

500.    CHS and its facilities have violated and continue to violate the federal FCA by committing acts to further the submission of claims to federal and/or state health care programs for services related to patient referrals which are tainted by CHS's federal and state Anti-

107

Kickback Statute violations.

## COUNT I (U.S. EX REL. MASON V. CHS) -
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A), (B), and (G)

501.    Relator Mason re-alleges ¶¶ 1-500 as though fully set forth herein.

502.    Claims submitted by Defendant CHS's facilities nationwide to federally or state funded health care programs (including Medicare, Medicaid, etc.) related to outpatient and in-patients services (ER tests, ancillary services, and admissions) that were not medically necessary constituted violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

503.    Claims submitted by CHS's facilities for out-patient services, including emergency room services, where the severity of care was inflated or supported by unnecessary tests are false and fraudulent and violate the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

504.    Claims submitted by CHS's facilities for unnecessary admissions and for the unnecessary tests that imply that the admission is medically necessary are false and violate the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

505.    Claims submitted by Defendant CHS's facilities to federally- or state- funded health care programs (including Medicare, Medicaid, etc.) related to tainted referrals (those stemming from violations of the federal Anti-Kickback Statute) also constituted violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

506.    Defendant CHS, directly or through its facilities nationwide, including, but not limited to, Dyersburg Regional, offered and/or provided incentives to emergency physicians and/or their physicians' groups to induce improper referrals of services to Defendant CHS's facilities.

108

507. Through these emergency physicians at CHS facilities nationwide, CHS facilities received referrals or recommendations for health services to beneficiaries of federally-funded health care programs in violation of the federal Anti-Kickback Statute.

508. Defendant CHS's violations of the federal Anti-Kickback Statute give rise to liability under the federal False Claims Act.

509. As a prerequisite to participating in federally-funded health care programs, Defendant CHS expressly certified (or, through their participation in a federally-funded program, impliedly certified) their compliance with the federal Anti-Kickback Statute.

510. Defendant CHS, through its facilities nationwide, violated the federal False Claims Act by submitting or causing the submission of claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that it was ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration through incentives offered and/or paid to emergency physicians and/or physicians' groups in the various CHS facilities.

511. Defendant CHS, directly or through its facilities nationwide, violated the federal False Claims Act by submitting and/or causing the submission of claims for reimbursement from state health care programs, including Medicaid, knowing that it was ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration paid to emergency room physicians through incentives and contracts based upon participation in CHS's scheme.

512. Each claim submitted by Defendant CHS, directly or through its facilities nationwide, to a federally- or state-funded health care program (including Medicare, Medicaid, etc.) for a service provided to a patient based on the referral or recommendation of an emergency

109

physician who accepted CHS's inducements is false because it is tainted by an illegal kickback.

513. Defendant CHS knowingly made, used, or caused to be made or used, false records or statements to cause the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). The false records or statements were: false certifications of necessity; and certifications and representations of full compliance with all federal and state laws.

514. Defendant CHS made or caused to be made such false certifications and representations in agreements under state and federal health care programs, including Medicare and Medicaid, to ensure that these programs would reimburse for services CHS facilities provided to beneficiaries of these programs.

515. Defendant CHS knowingly made, used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation by CHS facilities to pay or transmit money or property to the United States, in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

516. The Patient Protection and Affordable Care Act, (PPACA) 42 U.S.C. § 1128J(d), which Defendant CHS has violated, requires that Defendant CHS self-report and return Medicare and Medicaid overpayments within 60 days of identification.

517. The false records or statements were: the false certifications of medical necessity; and certifications and representations of full compliance with all federal and state laws.

518. All of the Defendant's conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

**WHEREFORE,** Relator Mason requests the following relief:

    A.    Judgment against Defendant CHS for three times

the amount of damages the United States has sustained because of its actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act;

B. 25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not;

C. His attorneys' fees, litigation and investigation costs, and expenses;

D. Such other relief as the Court deems just and appropriate.

## COUNT II (NORTH CAROLINA EX REL. MASON V. CHS) – NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. § 1-605 et. seq.

519. Relator Mason re-alleges ¶¶ 1-518 as though fully set forth herein.

520. This is a claim for damages and penalties under the North Carolina False Claims Act.

521. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

522. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the North Carolina State Government to approve or pay such false and fraudulent claims.

523. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that would not be paid but for Defendant CHS's illegal inducements.

524. By reason of the Defendant CHS's acts, the State of North Carolina has been

111

damaged, and continues to be damaged, in a substantial amount to be determined at trial.

525. The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

> A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the North Carolina Medicaid program has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of North Carolina Gen. Stat. § 1-607.

## COUNT III (CALIFORNIA EX REL. MASON V. CHS) -
## CALIFORNIA FALSE CLAIMS ACT
### Cal Govt. Code § 12651(a)(1) and (2)

526. Relator Mason re-alleges ¶¶ 1-525 as though fully set forth herein.

527. This is a claim for treble damages and penalties under the California False Claims Act.

528. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

529. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve or pay such false and fraudulent claims.

530. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant

112

CHS's illegal conduct.

531.    By reason of the Defendant CHS's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

532.    The State of California is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

WHEREFORE, Relator Mason requests the following relief:

A.    That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of California has sustained because of Defendant CHS's actions, plus a civil penalty of $11,000 for each violation of Cal Govt. Code § 12651(a)(1) and (2).

## COUNT IV (FLORIDA EX REL. MASON V. CHS) – FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. § 68.082(2)

533.    Relator Mason re-alleges ¶¶ 1-532 as though fully set forth herein.

534.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.082(2).

535.    By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

536.    By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

537.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by the Defendant, paid and continues

to pay the claims that would not be paid but for Defendant's illegal inducements.

538. By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

539. The State of Florida is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendant.

>    **WHEREFORE**, Relator Mason requests the following relief:
>
>    That this Court enter judgment against the Defendant CHS in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant CHS's actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. § 68.082(2).

## COUNT V (GEORGIA EX REL. MASON V. CHS) -
## GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1 (a)(1) and (2)

540. Relator Mason re-alleges ¶¶ 1-539 as though fully set forth herein.

541. This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

542. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

543. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Georgia State Government to approve or pay such false and fraudulent claims.

544. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and

114

continues to pay the claims that would not be paid but for Defendant CHS's illegal inducements.

545. By reason of the Defendant CHS's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

546. The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendant.

WHEREFORE, Relator Mason requests the following relief:

A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the Georgia Medicaid program has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Ga. Code Ann. § 49-4-168.1 (a)(1) and (2).

COUNT VI (ILLINOIS EX REL. MASON V. CHS) -
ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
740 Ill. Comp. Stat. § 175/3(a)(1) and (2)

547. Relator Mason re-alleges ¶¶ 1-546 as though fully set forth herein.

548. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

549. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

550. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve or pay such false and fraudulent claims.

551. The Illinois State Government, unaware of the falsity of the records, statements

115

and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

552. By reason of Defendant CHS's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

553. The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

> That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 740 Ill. Comp. Stat. § 175/3(a).

## COUNT VII (INDIANA EX REL. MASON V. CHS) - INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IC 5-11-5.5-2(b)(1), (2), and (8)

554. Relator Mason re-alleges ¶¶ 1-553 as though fully set forth herein.

555. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

556. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

557. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Indiana State Government to approve or pay such false and fraudulent claims.

558. By virtue of the acts described above, Defendant CHS knowingly caused or

116

induced another person to perform an act described in IC 5-11-5.5-2(b)(1) , (2) and/or (8).

559.　The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

560.　By reason of Defendant CHS's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

561.　The State of Indiana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

> **WHEREFORE**, Relator requests the following relief:
>
> A.　That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of IC 5-11-5.5-2(b).

## COUNT VIII (LOUISIANA EX REL. MASON V. CHS) - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### La. Rev. Stat. Ann. §§ 46:439.1-4, 46:440.1-4

562.　Relator Mason re-alleges ¶¶ 1-561 as though fully set forth herein.

563.　This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

564.　By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

565.　By virtue of the acts described above, Defendant CHS knowingly made, used or

Case 3:12-cv-00817-GCM   Document 4   Filed 01/09/13   Page 125 of 139

caused to be made or used false records and statements, and omitted material facts to induce the Louisiana State Government to approve or pay such false and fraudulent claims.

566. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

567. By reason of the Defendant CHS's acts, the State of Louisiana has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

568. The State of Louisiana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $11,000 for each violation of La. Rev. Stat. Ann. §§ 46:439.1-4, 46:440.1-4.

**COUNT IX (NEVADA EX REL. MASON V. CHS) -
NEVADA FALSE CLAIMS ACT
Nev. Rev. Stat. Ann. § 357.040.1(a) and (b)**

569. Relator Mason re-alleges ¶¶ 1-568 as though fully set forth herein.

570. This is a claim for treble damages and penalties under the Nevada False Claims Act.

571. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

118

572. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Nevada State Government to approve or pay such false and fraudulent claims.

573. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal inducements.

574. By reason of the Defendant CHS's acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

575. The State of Nevada is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

> A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $11,000 for each violation of Nev. Rev. Stat. Ann. § 357.040.1(a) and (b).

### COUNT X (NEW JERSEY EX REL. MASON V. CHS) NEW JERSEY FALSE CLAIMS ACT N.J. Stat. Ann. § 2A:32C-3(a) and (b)

576. Relator Mason re-alleges ¶¶ 1-575 as though fully set forth herein.

577. This is a claim for treble damages and penalties under the New Jersey False Claims Act.

578. By virtue of the acts described above, Defendant CHS knowingly presented or

119

caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

579. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the New Jersey State Government to approve or pay such false and fraudulent claims.

580. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

581. By reason of Defendant CHS's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

582. The State of New Jersey is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

WHEREFORE, Relator Mason requests the following relief:

A.   That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $11,000 for each violation of N.J. Stat. Ann. § 2A:32C-3(a) and (b).

## COUNT XI (NEW MEXICO EX REL. MASON V. CHS) - NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. Ann. § 27-14-4A and C

583. Relator Mason re-alleges ¶¶ 1-582 as though fully set forth herein.

584. This is a claim for treble damages and penalties under the New Mexico Medicaid

120

False Claims Act.

585. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

586. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the New Mexico State Government to approve or pay such false and fraudulent claims.

587. The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

588. By reason of Defendant CHS's acts, the State of New Mexico has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

589. The State of New Mexico is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

WHEREFORE, Relator Mason requests the following relief:

A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendant CHS's actions, plus a civil penalty of not less than $11,000 for each violation of N.M. Stat. Ann. § 27-14-4A and C.

121

## COUNT XII (OKLAHOMA EX REL. MASON V. CHS) -
## OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 Oklahoma Statutes Annotated § 5053 et. seq.

590.    Relator re-alleges ¶¶ 1-589 as though fully set forth herein.

591.    This is a claim for damages and penalties under the Oklahoma Medicaid False Claims Act.

592.    By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

593.    By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Oklahoma State Government to approve or pay such false and fraudulent claims.

594.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that would not be paid but for Defendant CHS's illegal conduct.

595.    By reason of Defendant CHS's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

596.    The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

A.      That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the Oklahoma Medicaid program has sustained because of Defendant CHS's actions, plus a civil penalty of

122

not less than $5,000 and not more than $10,000 for each violation of 63 Oklahoma Statutes Annotated § 5053.1.B;

B.     That this Court enter judgment against Defendant CHS in favor of Relator for attorneys' fees and costs, as authorized by 63 Oklahoma Statutes Annotated § 5053.4, and that Relator be granted such other and further relief as the Court deems just and proper.

## COUNT XIII (TENNESSEE EX REL. MASON V. CHS) - TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(A) and (B)

597.    Relator re-alleges ¶¶ 1-596 as though fully set forth herein.

598.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

599.    By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

600.    By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Tennessee State Government to approve or pay such false and fraudulent claims.

601.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that would not be paid but for Defendant CHS's illegal conduct.

602.    By reason of Defendant CHS's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

603.    The State of Tennessee is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be

made, used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendant CHS's actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. § 71-5-182(a)(1)(A) and (B).

## COUNT XIV (TEXAS EX REL. MASON V. CHS) -
## TEXAS MEDICAID FRAUD PREVENTION ACT
### Texas Code § 36.001, et. seq.

604.    Relator re-alleges ¶¶ 1-603 as though fully set forth herein.

605.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

606.    By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

607.    By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Texas State Government to approve or pay such false and fraudulent claims.

608.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that would not be paid but for Defendant CHS's illegal conduct.

609.    By reason of Defendant CHS's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

610.    The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made,

124

used or presented by Defendant CHS.

**WHEREFORE**, Relator Mason requests the following relief:

A. That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendant CHS's actions, plus a civil penalty of $10,000 for each violation of Texas Code § 36.002.

## COUNT XV (VIRGINIA EX REL. MASON V. CHS) – VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3A.1 and 2

611. Relator Mason re-alleges ¶¶ 1-610 as though fully set forth herein.

612. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

613. By virtue of the acts described above, Defendant CHS knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

614. By virtue of the acts described above, Defendant CHS knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Commonwealth of Virginia to approve or pay such false and fraudulent claims.

615. The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant CHS, paid and continues to pay the claims that are non-payable as a result of Defendant CHS's illegal conduct.

616. By reason of Defendant CHS's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

617. The Commonwealth of Virginia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused

125

to be made, used or presented by Defendant CHS.

**WHEREFORE,** Relator Mason requests the following relief:

A.     That this Court enter judgment against Defendant CHS in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendant CHS's actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. § 8.01-216.3A.1 and 2.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

This the ___9th___ day of ___January___, 2013.

Respectfully submitted,

WYATT & BLAKE, LLP

JAMES F. WYATT, III, ESQUIRE
NC Bar # 13766
ROBERT A. BLAKE, JR., ESQUIRE
NC Bar # 20858
435 East Morehead Street
Charlotte, NC 28202-2609
Tele. No.: (704) 331-0767
Fax: (704) 331-0773

and

PIETRAGALLO GORDON ALFANO
 BOSICK & RASPANTI, LLP

MARC S. RASPANTI, ESQUIRE
MICHAEL A. MORSE, ESQUIRE
PAMELA C. BRECHT, ESQUIRE
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Tele. No.: (215) 320-6200
Fax: (215) 981-0082

Attorneys for Qui Tam Plaintiff/Relator

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Relator's Severed Second Amended Qui Tam Complaint for Violations of Federal and State False Claims Acts and the Anti-Kickback Statutes has been served on the following in the manner listed below:

### VIA FEDERAL EXPRESS

Marie V. Bonkowski, Esquire
Senior Trial Counsel - Commercial Litigation Branch - Civil Division
United States Department of Justice
601 D Street, NW - Room 9116
Washington, DC 20004

Justin Draycott, Esquire
Senior Trial Counsel Commercial Litigation Branch - Civil Division
Patrick Henry Building
601 D St., NW, Room 9010
Washington, DC 20004

Sabrina Bindocci, Paralegal Specialist
Commercial Litigation Branch –
Civil Division
United States Department of Justice
601 D Street, NW – Room 1223
Washington, DC 20004

### VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED

F. Edward Kirby, Jr., Esquire - Assistant Attorney General
North Carolina Department of Justice - Medicaid Investigations Unit, NC
5505 Creedmoor Road, Suite 300
Raleigh, NC 27612

Donald H. Caldwell, Jr., Esquire - Assistant United States Attorney
United States Attorney's Office for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Edward R. Ryan, Senior Counsel - Assistant United States Attorney
United States Attorney's Office for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Jonathan H. Ferry, Esquire - Assistant United States Attorney
United States Attorney's Office for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Kelli H. Ferry, Esquire - Assistant United States Attorney
United States Attorney's Office for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Renae Elam, Paralegal Specialist
United States Attorney's Office
for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202

Raymond J. Liddy, Esquire - Deputy Attorney General
Office of the Attorney General, California Department of Justice
1455 Frazee Road, Suite 315
San Diego, CA 92108

Brian S. Hunter, Esquire - Assistant Attorney General
Office of the Attorney General - Medicaid Fraud Control Unit
Pl-01, The Capitol
Tallahassee, FL 32399-1050

Nancy B. Allstrom, Esquire - Assistant Attorney General for the State of Georgia
Georgia State Healthcare Fraud Control Unit
2100 East Exchange Place, Building 1, Suite 200
Tucker, GA 30084-5336

Robert Barba, Esquire - Assistant Attorney General
Illinois Attorney General's Office
100 West Randolph Street, 12th Floor
Chicago, IL 60601

Kristen Kemp, Esquire - Deputy Attorney General
State of Indiana Department of Justice
302 W. Washington Street
Indianapolis, IN 46204

Mimi Hunley, Esquire - Assistant Attorney General
Louisiana Department of Justice
1885 North 3rd Street
Baton Rouge, LA 70802

Mark N. Kemberling - Chief Deputy Attorney General
Office of the Attorney General - Nevada Department of Justice
555 East Washington Avenue, Suite 3900
Las Vegas, NV 89101

Christopher Robinson, Assistant Attorney General
Patient Abuse and Medicaid Fraud Control Unit - Oklahoma Office of Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

J.D. Thomas, Assistant United States Attorney
United States Attorney's Office for the Middle District of Tennessee
110 9th Avenue South
Suite A-961
Nashville, TN 37203

Timothy P. Harlan, Assistant Attorney General
State of Tennessee Office of the Attorney General
425 Fifth Avenue, North
Nashville, TN 37243

Justin Dunlap, Esquire - Assistant Attorney General
Office of the Attorney General - Civil Medicaid Fraud Division
300 W. 15th Street
Austin, TX 78701

Kristina M. Kennedy, Esquire - Assistant Attorney General
Office of the Attorney General - Civil Medicaid Fraud Division
300 W. 15th Street
Austin, TX 78701

Kimberly M. Bolton, Esquire - Assistant Attorney General
Medicaid Fraud Control Unit, Civil Investigations Squad
Virginia Attorney General's Office
900 East Main Street
Richmond, VA 23219

Attorney Jeffrey S. Chiesa
Office of the Attorney General
New Jersey Division of Criminal Justice
Medicaid Fraud Control Unit-FCA Unit
Richard J. Hughes Justice Complex - 8th Floor, West Wing
25 Market Street, PO Box 085
Trenton, NJ 08611

Attorney General Gary K. King
Office of the Attorney General
111 Lomas Boulevard, NW, Suite 300
Albuquerque, NM 87102


PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP


*Marc S. Raspanti / by RAB with permission*

MARC S. RASPANTI, ESQUIRE
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Tele. No.: (215) 320-6200
Fax: (215) 981-0082

Attorneys for Qui Tam Plaintiff/Relator
Thomas L. Mason, M.D.

2426136v1